1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF DELAWARE

3

4       DELAWARE DISPLAY GROUP LLC,  :   CA NO. 13-2108-RGA,

5       et al.,                      :   13-2109-RGA,

6                                    :   13-2112-RGA

7                    Plaintiffs,     :

8                                    :

9            v.                      :   March 29, 2016

10                                   :

11      LENOVO HOLDING COMPANY INC., :

12      et al., LG DISPLAY, LG       :

13      ELECTRONICS, et al., and     :

14      VIZIO INC., et al.,          :

15                                   :

16                    Defendants,    :   9:07 o'clock a.m.

17      ............................:

18

19

20                    TRANSCRIPT OF DISCOVERY DISPUTES

21              BEFORE THE HONORABLE RICHARD G. ANDREWS

22                    UNITED STATES DISTRICT JUDGE

23

24

25

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:      FARNAN LLP

 4                         BY:  BRIAN E. FARNAN, ESQ

 5                                 -and-

 6                         BRAGALONE CONROY, P.C.

 7                         BY:  JEFFREY R. BRAGALONE, ESQ

 8                         BY:  T. WILLIAM KENNEDY, JR., ESQ

 9                         BY:  JAMES R. PERKINS, ESQ

10                         BY:  JUSTIN B. KIMBLE, ESQ

11

12

13    For Defendants:      ROSS, ARONSTAM & MORITZ

14                         BY:  BENJAMIN J. SCHLADWEILER, ESQ

15                                 -and-

16                         MAYER BROWN LLP

17                         BY:  JAMIE B. BEABER, ESQ

18                         BY:  AMANDA K. STREFF, ESQ

19                         BY:  TIFFANY A. MILLER, ESQ

20                         For Defendants LG Electronics & LG Display

21

22                         YOUNG, CONAWAY, STARGATT & TAYLOR

23                         BY:  PILAR G. KRAMAN, ESQ

24                                 -and-

25
```

```
1                      GIBSON DUNN & CRUTCHER

2                      BY:  JASON C. LO, ESQ

3                      For Defendant VIZIO Inc

4

5                      POTTER, ANDERSON & CORROON

6                      BY:  STEPHANIE E. O'BYRNE, ESQ

7                              -and-

8                      AKIN GUMP LLP

9                      BY:  ERIC J. KLEIN, ESQ

10                     For Defendant Lenovo Holding Company Inc

11

12

13

14

15

16

17

18

19

20

21

22

23   Court Reporter:         LEONARD A. DIBBS

24                           Official Court Reporter

25
```

1                    P R O C E E D I N G S

2

3              (The proceedings occurred at 9:06 o'clock a.m. as

4      follows:)

5

6              THE COURT:  All right.

7              Good in morning, everyone.  Please be seated.

8              Can we have the appearances of who's here, please?

9              MR. FARNAN:  Good morning, your Honor.

10             Brian Farnan on behalf of the plaintiff.

11             With me today is Jeff Bragalone, Justin Kimble, Bill

12     Kennedy, and James Perkins, all from Bragalone & Conroy in

13     Dallas, Texas.

14             THE COURT:  Good morning to you all.

15             Ms. Kraman.

16             MS. KRAMAN:  Good morning, your Honor.

17             Pilar Kraman for VIZIO.

18             With me is Jason Lo from Gibson Dunn.

19             THE COURT:  Good morning.

20             Mr. Schladweiler.

21             MR. SCHLADWEILER:  Good morning, your Honor.

22             Ben Schladweiler from Ross, Aronstam & Moritz on behalf

23     of LG Display and LG Electronics.

24             I'm here today with Jamie Beaber, Amanda Streff, and

25     Tiffany Miller from Mayer Brown.

1          THE COURT:  Good morning to you all.

2          Ms. O'Byrne.

3          MS. O'BYRNE:  Good morning, your Honor.

4          Stephanie O'Byrne from Potter, Anderson & Corroon for

5     the Lenovo defendants.

6          With me today is Eric Klein from Akin Gump.

7          THE COURT:  Good morning to you all.

8          All right.

9          So, I have read all of your letters, and unless there's

10    something else you want to do, I was just going to start going

11    through them starting with the Lenovo case.  I went through them

12    in numerical order.

13         And, so, the first thing that Lenovo -- that plaintiff

14    wants is technical documents and specifications from CPT,

15    current supply agreement covering the sales between CPT and

16    Lenovo for LCM Incorporated of the accused products, and the

17    agreements governing the terms of Lenovo's arrangements with its

18    original equipment manufacturers for the accused products.

19         And, as I understand it, the defendants, you, is that

20    nothing from CPT has been charted, and, therefore, it's not in

21    the case.

22         Have I got the basic argument here.

23         MR. KLEIN:  Yes, your Honor.

24         THE COURT:  All right.

25         So, plaintiff, has the CPT been charted?

1          MR. KIMBLE:  Good morning, your Honor.

2          May I?

3          THE COURT:  Sure, Mr. Kimble.

4          Good morning.

5          MR. KIMBLE:  Good morning.

6          THE COURT:  I see you've made my surveillance at the

7     airport?

8          MR. KIMBLE:  So, as I think the Court knows -- and this

9     isn't in dispute -- the Lenovo products come in what I'll call

10    different flavors.

11         So, a Lenovo laptop might have LCMs from LG Display,

12    CPT, others.

13         THE COURT:  Right.

14         MR. KIMBLE:  So, we have charted Lenovo products, you

15    know, laptops, tablets, that does come in the CPT flavor, but

16    the chart that we have, has in it a, for example, an LG Display,

17    LCM.

18         The reason for that is, because when we had it -- going

19    out and just trying to proper cure them, it's just -- it's hunt

20    and peck.

21         We would buy multiple --

22         THE COURT:  Well, so, what you're saying is, the chart

23    says, LG as the LCM?

24         MR. KIMBLE:  That's right.

25         So, the chart is for a particular Lenovo laptop.

1     That's the accused products.

2          And within that, the -- the particular portions that

3     were focused are within an LCM from LG Display.

4          THE COURT:  Okay.  Now, you say the accused product is

5     the laptop.  I thought the accused products were LCMs?

6          MR. KIMBLE:  So, with respect to Lenovo that's not --

7     that's not the case.

8          The accused product is the end-customer products.

9     That's also true for VIZIO.  That's also true LGD.

10         With respect to go LGD, that's different, because LGD

11    doesn't sell, itself, televisions.  It's only sells LCMs.

12         Where -- what we have done -- what we could is acquire

13    LCMs.  If we could acquire those directly based on the discovery

14    responses, we would acquire LCMs, if we could.

15         But with respect to Lenovo, we had to buy end-user

16    products, and been didn't -- weren't able to acquire end-user

17    products that had in it the CPT LCM.

18         Now, I don't think it's in dispute that there are CPT

19    technical documents that haven't been produced.

20         And what we would say is, if those had been, or would

21    be now produced, we could, you know, add those to our

22    contentions for the products that are already in the case.  It's

23    not new products, it's the same products.  It's just a different

24    flavor of the products.

25         THE COURT:  All right.

1          Do you have anything else to say on this?

2          MR. KLEIN:  Not about that issue, no.

3          THE COURT:  All right.

4          Mr. Klein, do you have something to say?

5          MR. KLEIN:  Yes, your Honor.

6          Good morning, your Honor.

7          THE COURT:  Good morning.

8          MR. KLEIN:  So, your Honor, I think Exhibit E to our

9    letter will show what an example of their contentions look like.

10         They say that they charted accused products and the

11   accused products are actually the Lenovo laptops, but that's not

12   true.

13         They included a single picture of a laptop on the front

14   page, and then every other page it is charting an LG Display

15   panel.

16         It has nothing to do with CPT.  There's no evidence

17   that a CPT panel is constructed the same as an LG panel.

18         And I think your Honor has already ruled that

19   representative products are not allowed in this case.

20         THE COURT:  Well, so, is it -- so, I don't have --

21   because there's only so much I can carry around -- I don't have

22   Exhibit E, or whatever it is that you're talking about here in

23   front of me.  I have no recall of looking at it.

24         MR. KLEIN:  May I approach?

25         THE COURT:  Does Mr. Bragalone and Mr. Kimble know what

1   you're showing me?

2          (Pause)

3          Give it to him, please.

4          All right.

5          So, this thing that you're showing me, Exhibit E is

6   about 23 pages long.  It has a picture of an IdeaPad, Y510p on

7   Page 1.

8          Then it's says the Lenovo IdeaPad, Y510p, which

9   contains LG Display, and then it is has LG display information,

10  including an LG Display bar code.

11         And I assume that the rest of the charting -- you tell

12  me what's the relevance of this charting here.

13         MR. KLEIN:  Your Honor, the rest of the chart is --

14  includes technical information about the specific LG Display

15  panel that is identified on Page 2.  There's not another picture

16  or reference to the actual IdeaPad that is on the first page.

17         Early in the discovery process, we informed the

18  plaintiffs of all of the potential options of panels of LCMs for

19  each of the accused products, but they, for whatever reason,

20  chose only to chart, at least for certain products, the LG

21  display panels.

22         THE COURT:  All right.

23         What else do you have to say?

24         MR. KLEIN:  Your Honor, I believe that they've offered

25  no evidence, and there's certainly no reason to believe that all

1    of the different manufactured panels are constructed in exactly

2    the same way.  And we're seeing it even across LG panels that

3    have been disassembled.  There are large differences between

4    each one.

5         So, given your Honor's prior ruling that the

6    representative products are not proper here, this is not a

7    different flavor, as the plaintiffs have put it.  These would be

8    charted as separate -- completely separate different products.

9         THE COURT:  All right.

10         Anything further, Mr. Kimble?

11         MR. KIMBLE:  Briefly.

12         One thing I want to add that I didn't mention is, our

13    early initial charts did identify Lenovo products that only came

14    as a CPT product.  We bought six of those and couldn't find --

15    couldn't come up with the one that had a CPT product in it.

16         I also just wanted to emphasize that, again, the

17    accused products, even in those exhibits that you looked at, the

18    Lenovo IdeaPad, Y510p, it's not the LGD, LCM within it,

19    although, that is what the chart focuses on.

20         And the last thing I would say is, again, in terms of

21    lack of evidence of similarity between the CPT LCM and LGD LCM,

22    I don't think that it's fair for Lenovo to withhold the

23    technical documents, and then tell us that, well, you haven't

24    proven that they're the same.

25         We have certainly tried to acquire these as best as we

1   could.  And I think the fact that it's not in dispute that

2   certain of these products come in these different favors,

3   suggest that they're highly similar, and that's why they yield

4   to dual source.  In terms of these suppliers, they wouldn't have

5   wildly different LCMs in them, but they may have wildly

6   different performance, you would think.

7          So, I do think that there is some evidence at least

8   that they are very similar.

9          And, so, that's why we would ask for those documents be

10  produced, so we can look at those and determine how similar they

11  are, in fact.

12         THE COURT:  All right.

13         So, while we're on this topic, you also requested the

14  supply agreements between CPT and Lenovo.  And one of the notes

15  that I have here, which I think, because you said it in your

16  letter, it seems to be the case as true is, Mr. Klein, you said

17  on December 22nd, 2015, that Lenovo had produced all the

18  supplier agreements they have.

19         And yet, in your letter in this series, it seemed to me

20  that you were saying, well, we didn't have to produce CPT,

21  because it's not been charted, and it's too late now.

22         Do you have any comment on that?

23         MR. KLEIN:  I do, your Honor.

24         I believe we did produce the CPT Supply Agreement.  My

25  understanding is that they were looking for other types of

1    agreements or statements of work that will come up in the LG

2    issue, so I just think that it was further production that we

3    didn't believe was necessary.

4         THE COURT:  Did you get a CPT Supply Agreement between

5    CPT and Lenovo, do you know?

6         MR. KIMBLE:  I think the answer is no, your Honor.

7         What I do know is, or what we did learn through the

8    depositions is that were there -- even where we had an

9    agreement, for example, an LGD agreement, they had produced some

10   of those, but they didn't produce all of them, so it became

11   clear that we didn't have all of these agreements.

12        I think your Honor is right.

13        What they're saying now is, we don't have to do that.

14        THE COURT:  Well, they're not saying that about LG.

15        So, that's one of things that is sometimes frustrating

16   when you're sitting in my position is, you know, kind of

17   tangent, before you get anything actually resolved, you're off

18   on to something else.

19        Mr. Klein says, I think he just said, yeah, we produced

20   at least a Supply Agreement between CPT and Lenovo.

21        You say you don't think he did.

22        Mr. Klein, do you happen to have a citation to

23   somewhere, you know, a number or something else, as to what the

24   CPT agreement that you produced was?

25        MR. KLEIN:  Your Honor, I don't, but I'm happy to go

1   look.

2          If we did have one agreement, it was our intention to

3   produce it.  I thought we did.  I'll check.

4          THE COURT:  Maybe you did.  Maybe you didn't.

5          It's hard to -- when you're saying, yeah, I do, but I

6   don't know what the numbers are.

7          He's saying, I don't know.

8          I mean, how can he -- maybe Mr. Kimble is really

9   organized, but it's kind hard to know, because having briefed

10   lots and lots of documents.

11          So, I do intend, when we're through today, to sign a

12   bunch of these orders with the appropriate modifications, but

13   there is something that I'm not going to sign, because I'm not

14   prepared.

15          So, I'm going to direct that CPT -- it doesn't

16   necessarily go totally to the discovery issue, it just goes to

17   kind of making sure that the representations -- because I have

18   to rely on the representations you all make to some extent.

19          And it's not very satisfying to me to have this

20   unresolved, so I'm going to direct, Mr. Klein, that you get some

21   discovery citation by the end of the day as to the Supply

22   Agreement that you produced between CPT and Lenovo for LCMs

23   incorporated into the accused products.

24          And get something.  Give it to Mr. Kimble.  If you

25   don't get something, then -- let's say you don't have something,

1      what are you going to do to make it right?

2              MR. KLEIN:  We'll produce it.

3              THE COURT:  And, so, then the third part of this first

4      part of the order request was, agreements governing the terms of

5      the Lenovo's arrangements with its OEM for the accused products.

6              I wasn't entirely sure what we were talking about here.

7              I have a note to myself, that Lenovo says it's produced

8      all of them, but I didn't think either of you cited much of

9      anything in support of whatever the dispute is here.

10             So, Mr. Kimble, can you tell me what kind of thing

11     you're -- this is looking for?  Can you just tell me on this?

12             MR. KIMBLE:  Yes, your Honor.

13             So, to distinguish between what we're talking about

14     with respect to an LCM supplier, we're talking about a level

15     closer to the final products.

16             THE COURT:  Right, right.  The OEM is somebody who

17     sends a laptop to Lenovo --

18             MR. KIMBLE:  Right.

19             THE COURT:  -- and Lenovo slaps Lenovo on it and out

20     the door it goes?

21             MR. KIMBLE:  That's correct.

22             And through the depositions they identified some, but

23     not all of the OEMs.

24             And what we're asking for is the agreements between

25     Lenovo and the OEMs, you know, the terms of the relationship

1    between them.

2              THE COURT:  Why is this important?

3              MR. KIMBLE:  So, what we think this helps us understand

4    is the process from, you know, beginning to customer sales in

5    the U.S.  And what we think is that may help us to identify is,

6    is to prove where infringing acts occur, you know, where

7    products are delivered, for example, imported, shipped to.

8              THE COURT:  Well, if Lenovo sells the products in the

9    U.S., and there is -- the LCM infringes, isn't Lenovo going to

10   be directly infringing?

11             MR. KIMBLE:  That's right.

12             And so, I think what we have is a representation as to

13   some U.S. sales.  What we --

14             THE COURT:  Well, so, wait, let's just go back, because

15   I thought you had -- and, you know, unfortunately, because there

16   are three defendants here, and there's lots of words, I get

17   mixed up sometimes as to who said what.  But hasn't Lenovo

18   produced all of its you U.S. sales of all of the accused

19   products?

20             MR. KIMBLE:  That's what I think they have represented

21   that they have done that.

22             What I was going to say is, getting agreements like

23   this would help us to evaluate, sort of the back-up for that

24   representation, and --

25             THE COURT:  All right.

1           If that's what you're doing, then I'm going to deny

2    that.  I think it's just redundant.  You got their U.S. sales.

3    I'm going to cross that one out.

4           All right.

5           So, what I'm going to do on the CPT issue is, I don't

6    think that they've been charted.  I don't think they're still in

7    the case, and so, I'm going to cross out No. 1 on this Proposed

8    Order entirely.

9           All right.

10          Let's go on to No. 2, which is, Lenovo will make

11    available an additional 30(b)(6) witness to testify as to

12    various topics, including document collection, agreements

13    between Lenovo and third parties re:  accused products, BLUs,

14    and LCMs, a factual bases for Lenovo's defenses, and sales and

15    sales records, as well as the documents produced by Lenovo from

16    January 12, 2016, to the present.

17          Well, let me see here.

18          So, I saw this person who I, if I can read my

19    handwriting correctly, was named Boyack, or it could be Bonzack,

20    I can't tell, or maybe Bojack (ph), was disposed on January

21    14th, is that right?

22          MR. KLEIN:  Yes, your Honor.

23          THE COURT:  And there was some other guy, who I can't

24    read the name, Johnson, who I gathered was probably deposed the

25    day before?

1           MR. KLEIN:  The day before.

2           THE COURT:  All right.

3           And they were Lenovo's 30(b)(6) witnesses on various

4     topics.  And I gather Johnson was on four topics and the other

5     person, whose name I can't read, was on a lot of different

6     topics?

7           MR. KLEIN:  That's correct, your Honor.

8           THE COURT:  And based on my notes here, I think there

9     was a general complaint that Mr. Johnson was not very well-

10    prepared, although, I think, if I'm not confusing this with

11    someone else, he spent 11 hours getting ready for his

12    deposition?

13          MR. KLEIN:  Your Honor, I believe that their statement

14    is that it was one hour.

15          THE COURT:  Well, presumably, he was asked in the

16    deposition, was it one hour?

17          MR. KIMBLE:  Yes.

18          THE COURT:  Okay.  And his topics had to do with sales?

19          MR. KIMBLE:  Yes, your Honor.

20          THE COURT:  And are all of these topics being raised on

21    the theory that the two witnesses were not prepared enough to

22    address them, or is there is -- other than the documents from

23    January 12th, 2016 to the present, which I understand is a

24    different basis, are the rest of them all based on, they weren't

25    sufficiently prepared?

1            MR. KIMBLE:  Well, there is some overlap, I think,

2     between the documents that were produced, a significant amount

3     of documents that were produced after the deposition.

4            THE COURT:  Right.  I think that's a separate category.

5            MR. KIMBLE:  I understand, your Honor.

6            I'm saying, I think there's some overlap, but to your

7     question, yes, that's right.  We identified the areas where we

8     don't believe they were sufficiently prepared.

9            THE COURT:  All right.

10           Mr. Klein, what do you have to say about that?

11           Your Honor, with respect to Mr. Johnson on his four

12    topics, they were only related to sales information.  And Mr.

13    Johnson's job at Lenovo is tracking sales, keeping track of

14    costs.

15           So, the preparation for him -- he's been Lenovo's

16    30(b)(6) witness on these same topics in several cases over the

17    last couple of years.

18           He actually created the sales documents.  He's

19    intimately familiar with them.  So, the time of preparation for

20    him is -- should be less than an indication of his preparedness.

21           And for the sales documents --

22           THE COURT:  And the sales documents, that's part of the

23    recent production, and I believe Lenovo's spin on that is, this

24    was updating information?

25           MR. KLEIN:  Yes, your Honor.

1          We made the initial production, I believe, it was in

2     October -- September or October of last year for all of the

3     accused products.

4          The production that was made before -- during -- after

5     January 12th was just bringing that same data current, up to the

6     time of the production was made.

7          So that was --

8          THE COURT:  All right.

9          So, hold on a minute.

10          So, Mr. Kimble, in terms of the sales information that

11     is being produced, the documentary information, do you generally

12     agree with Mr. Klein's characterization?

13          MR. KIMBLE:  That it was a supplement?

14          Yes.

15          THE COURT:  I mean, was it an updating kind of

16     supplement because of the passage of time?

17          MR. KIMBLE:  I think that that's -- I think that that's

18     right. .

19          THE COURT:  All right.

20          So, in terms of the documents that were being produced

21     January 12th, and thereafter, what other categories of stuff

22     were there?

23          MR. KIMBLE:  Oh, so, there were technical documents,

24     supply agreements.  There was a variety of things.

25          We wrote him a letter that said, we need a bunch of

1    documents and they started to produce documents.  In fact,

2    several thousand pages were produced in the days during the

3    depositions.

4            THE COURT:  No, no, I understand there was stuff

5    happening that you could not reasonably be expected to be

6    digesting as you were going along.

7            MR. KIMBLE:  Right.

8            So, the technical documents, supply agreements, testing

9    documents, specifications for approval.  There's a variety of

10   documents that were produced in, you know, the days and perhaps

11   weeks following the depositions.

12           THE COURT:  All right.

13           So, in any event, we've just talked about Mr. Johnson

14   and he's about the sales and the sales records.

15           And all things considered, I don't believe that he was

16   such a bad Rule 30(b)(6) witness that it needs to be done over

17   again in part.

18           So, let's hold that thought.

19           Mr. Klein, I thought in your letter, at least according

20   to my notes here, these other topics that were the subject of

21   Mr. Kimble's request for further deposition, document

22   collection, agreements between Lenovo and third parties, the

23   factual bases for your defenses, and then more recent documents,

24   I don't think you specifically addressed them in your letter as

25   to why these were -- well, as to why this was a bad idea.

1          Did you address them?  Do you have something to say

2     about them specifically?

3          MR. KLEIN:  I think in part, your Honor.

4          So, I think the majority of the documents, or a good

5     portion of them, were just additional marketing documents that

6     were produced that literally, you know, we were -- there was

7     a -- for example, there was a study that came in, I think, some

8     time in late December that was done on displays that was not

9     available prior that, so we actually received a study report and

10    we produced that as soon as we received it.

11         Again, some of the marketing documents.  And I think

12    during the deposition, itself, were the marketing person.  There

13    was -- I don't think any of the previous marking documents were

14    discussed with the witness.  These were just additional

15    marketing documents.

16         And there were some additional specification documents.

17    I wouldn't know call them technical documents.  They don't show

18    a lot of detail about the panels.  It's more of a high-level,

19    this is what has been approved for this product, and it goes

20    through some of the information.

21         THE COURT:  Why were these technical documents just

22    being produced then?

23         MR. KLEIN:  Your Honor, I think we learned that there

24    was another set of documents, and we wanted to make the set

25    complete.

1          I believe some previous versions of those documents

2     were produced, but it was not the full set, and we wanted to

3     produce them all.

4          THE COURT:  All right.

5          And so, these topics that the plaintiff is asking for

6     more 30(b)(6) time other, than the sales and sales records,

7     which we've talked about, these were all topics that you already

8     produced, presumably Mr. Bonzack (ph), produced the 30(b)(6)

9     witness on?

10         MR. KLEIN:  Yes, we produced -- it's Mr. Boyack.  I

11    apologize.

12         THE COURT:  Boyack, sorry.

13         Why are you apologizing?

14         I wrote the name down and I just can't read my own

15    handwriting.

16         MR. KLEIN:  Mr. Boyack was put up as a witness on all

17    those topics, your Honor.  We believe his testimony was more

18    than adequate for those topics.

19         And for some of the documents that were -- that have

20    recently been produced, I think they're of marginal relevance to

21    the case.

22         THE COURT:  All right.

23         And so, Mr. Kimble, is it correct that Mr. Boyack, who

24    I think you -- I think the phrase is, you damned with faint

25    praise saying he was better than Johnson.

1          Mr. Boyack was put up on all those topics?

2          MR. KIMBLE:  That's right.

3          Our concern is not that he wasn't identified, it's just

4     the scope of his testimony.

5          THE COURT:  All right.

6          So, here's what I'm going to do, because I looked

7     yesterday -- yes, yesterday, at the things that were cited in

8     the letters as to evidence of people unprepared, and I didn't

9     think that I was convinced that Mr. Boyack was unprepared for

10    his deposition.

11         So, I will -- but I do think -- and I think I said this

12    earlier, and everybody knows the ideal way to do this, you

13    produce the documents, and then you have the deposition.

14         So, I'm going to allow Lenovo, or I'm going to allow

15    the plaintiff to basically designate, as an additional topic,

16    the documents produced by Lenovo from January 12th, 2016, to the

17    present for a Rule 30(b)(6) deposition on whatever is of

18    interest to plaintiff in those documents.

19         Mr. Klein?

20         MR. KLEIN:  Your Honor, we would ask that that be

21    limited in time somewhat because it's a single topic.

22         And the documents are all very similar documents.  I

23    don't think putting someone for an entire day on document

24    production would be necessary.

25         THE COURT:  Well, it's hard for me to say.

1          Mr. Kimble, do you have anything to say about it?

2          MR. KIMBLE:  Well, I guess what I -- I think two

3     things.

4          First of all, we're talking about a lot of documents,

5     so it's a little hard to come up with a time.  We're talking

6     about 13, almost 14,000 pages of documents.

7          THE COURT:  So, wait a second.

8          Do you agree that's the right ballpark for the number

9     of documents?

10         MR. KLEIN:  Yes, sir.

11         THE COURT:  Okay.

12         MR. KIMBLE:  So, we'll do our best.

13         THE COURT:  So, I mean, are you talking -- just to give

14    me a sense -- I think I know what I'm going to do here.

15         Mr. Klein, when you say a reasonable time for 14,000

16    documents, what are you thinking?

17         MR. KLEIN:  I believe a half day would be adequate.

18    The documents are -- a lot of them are in groups and are very

19    similar.

20         THE COURT:  Mr. Kimble, what are you thinking?

21         MR. KIMBLE:  How about five hours?

22         THE COURT:  Five hours.

23         All right.  That's it.

24         So, I'm going to change this to say -- well, so, Mr.

25    Klein, if I change it to say by April 22nd, 2016, Lenovo will

1    make available an additional 30(b)(6) witness in the United

2    States to testify as to the documents produced by Lenovo from

3    January 12th, 2016, to present, that's something that you can

4    comply with?

5              MR. KLEIN:  Your Honor, Mr. Boyack does travel

6    internationally.  I believe I can, but subject to his schedule,

7    we will certainly make an effort to do that.  And I'm fairly

8    certain we can, but without knowing his schedule, I can't

9    promise that exactly.

10              THE COURT:  Okay.  And I will also add in for five

11    hours.

12              All right.

13              And then we have the third request here is the limited

14    number of prior art references to five per patent, which I

15    believe I also saw in VIZIO's -- or I know it's in at least one

16    -- or it's a common thing.

17              So, what I noticed about the fact, of course, on this

18    topic is that defendants did not say, which is the usual thing I

19    hear, you know, plaintiffs have a hundred claims they're

20    asserting, so we need to have a hundred prior art references or

21    something else like that.

22              I know we're down to two patents here.

23              How many claims are you presently asserting?

24              MR. BRAGALONE:  12.  Six per patent, your Honor.

25              THE COURT:  So, I'm going to limit the number of prior

1     art references.

2          I understand the defendants' argument is, they accused

3     a lot of products.

4          I have to say that I don't intend to think that's a

5     particularly germane response.

6          But, in any event, I will listen to you as to how much

7     I should limit them per patent.  I'm not sure five is the

8     answer.

9          Who's going to talk about this?

10          MR. BRAGALONE:  I will, your Honor.

11          I'll be brief.

12          THE COURT:  Okay.  So far you're winning, so what are

13     you going to add?

14          MR. BRAGALONE:  I would add that I think we understated

15     the count.  And I would like to actually present the Court with

16     their supplemental invalidity contentions, because they --

17          THE COURT:  Well, which count, the four octillion or

18     the 47?

19          MR. BRAGALONE:  The 47, your Honor.

20          THE COURT:  I was hoping it was the four octillion.

21          MR. BRAGALONE:  That would be understated as well,

22     based on an understatement of the first --

23          THE COURT:  Well, so, if it's 47, or if it's more than

24     47, it's still way more than it can possibly be.

25          MR. BRAGALONE:  Yes, your Honor.

1          THE COURT:  So, why don't you tell me what you're

2     revised count is?

3          MR. BRAGALONE:  I was going to present this to your

4     Honor.

5          THE COURT:  Okay.

6          MR. BRAGALONE:  If I may approach?

7          THE COURT:  Okay.

8          MR. BRAGALONE:  By their own count on Pages 6, 7, 9,

9     10, 11, 12, 13.  It ends on 14.  They list a 115 prior art

10    references.

11         Then they go on to list an additional 18 prior art

12    products.

13         THE COURT:  I'm sorry.  Prior 18 what?

14         MR. BRAGALONE:  Prior art products.

15         THE COURT:  Okay.

16         MR. BRAGALONE:  So that those are all the references.

17         And then in their statement of anticipation on Pages 17

18    and 18, they proceed to list out these various numbers.

19         And then, critically, they say that's not it.

20         They say, and I quote from Page 21:

21         "The prior combinations are not exhaustive.  Rather,

22    they are illustrative examples of the prior art combinations

23    disclosed generally above.  Many more combinations are

24    possible."

25         They also say they incorporate by reference -- and I'm

1    reading from the last paragraph on Page 21 -- "each and every

2    prior art reference of record in the prosecution of the

3    patents-in-suit, including all patents related to the

4    patents-in-suit, as well as the prior art discussed in the

5    specification of the patents-in-suit."

6         THE COURT:  So, I guess what we're really talking

7    about, when we get to obviousness for octillion, octillion.

8         MR. BRAGALONE:  It really is a large number.  And

9    that's all I wanted to add, your Honor, is to correct our prior

10   undercount.

11        THE COURT:  All right.

12        Mr. Klein?

13        MR. KLEIN:  Your Honor, we would just note that, you

14   know, this is certainly trying to narrow the case for trial.

15        And the plaintiffs -- the reason we came up with the

16   product is, they're still pursuing over 1500 products.  That's

17   certainly not something that they can take to trial, the 1500

18   products.

19        So, these products are all very different.  They're

20   built in different ways.

21        THE COURT:  But the invalidity, the prior art

22   references, I am not sure that I get why -- whether they're

23   accusing one product based on five, six claims, or whether

24   they're accusing 1500 products based on six claims, why that

25   makes a difference?

1           MR. KLEIN:  Your Honor, for the jury, there are

2   certain, for example, prior art systems in the patents that line

3   up with certain products.  And the way they're accused, we can

4   make out a better argument for invalidity.  We believe they're

5   all invalidating, but we can make out a better argument as to

6   how they're accused.

7           And the parties are now arguing --

8           THE COURT:  Well, so, you're talking now about how you

9   would use these prior systems, okay?

10          MR. KLEIN:  Systems and patents.

11          THE COURT:  All right.

12          I'm more sympathetic -- well, let me think about this

13  for a second.

14          So, a system in this case would be some kind of LCM

15  that was presumably in existence before whatever the priority

16  date is?

17          MR. KLEIN:  Yes, your Honor.

18          THE COURT:  And Mr. Bragalone just said, if I was

19  capturing what he said correctly in my head, that besides for

20  the hundred plus prior art publication-type references, that

21  there were 11 systems also?

22          MR. KLEIN:  Approximately, 11.

23          MR. BRAGALONE:  18, your Honor.

24          THE COURT:  18.  Okay.

25          MR. KLEIN:  Your Honor, the parties are currently going

1    through, analyzing, and inspecting the teardowns to match up the

2    teardowns with the samples and the infringement contentions.

3           So, everyone is busy doing that, so we actually haven't

4    had a very meaningful conversation about limiting prior art,

5    which the defendants are amenable to do.

6           This actually just came up very recently on the last

7    meet-and-confer, so we just haven't had time to have a

8    discussion about that, and we're certainly willing to do that.

9           Being forced to do that before we see the samples, and

10   the plaintiffs actually have an outstanding deposition notice to

11   a prior art third party who provided prior art, so I don't

12   believe that's even scheduled yet.

13          THE COURT:  The third party provides prior art.

14          That means we're presumably talking about the system,

15   right?

16          MR. KLEIN:  Yes, I believe so.

17          THE COURT:  So here's what I'm inclined to do.

18          I'm inclined -- well, first off.

19          Do you agree that the supplemental invalidity

20   contentions that Mr. Bragalone handed up, among other things,

21   does say, here's a 115 prior art publications?

22          MR. KLEIN:  Yes, your Honor.

23          But I believe the defendant's intentions are only to

24   proceed on the actual pieces of prior art that were charted.

25          THE COURT:  And how many is that, 47?

1          MR. KLEIN:  Approximately, 47.

2          THE COURT:  All right.  Okay.

3          So, today is March 29th.  Yes, it's March 29th.  And I

4     am bearing in mind that the plaintiff has, at least as to the

5     number of asserted claims, what's a relatively streamlined case

6     at this point -- did I make you do that?

7          MR. BRAGALONE:  No, your Honor, certain patents were

8     dismissed that we --

9          THE COURT:  Well, no, no, I know.  But in terms of the

10    six asserted claims from each of these two patents, that's your

11    own good judgement, not something that I forced upon you?

12         MR. BRAGALONE:  Yes, your Honor.

13         THE COURT:  Okay.  Well, thank you for that.

14         I'm going to limit, say, that by -- you know, I have

15    more sympathy, Mr. Klein, for your concern about these prior art

16    systems, which -- and maybe there is fact discovery still going

17    on and maybe -- I can see why there might be strategic choices

18    that you would want to make based on, not as a matter of law,

19    but just as a matter of practice in terms of how the trial is

20    going to shake out.

21         So, what I'm going to do is, I'm going to limit, say by

22    a date, and unless you tell me April, that there is something

23    wrong with April 15th, that you need to limit the number of

24    prior art -- if I say "publication," does that include basically

25    anything that's printed, including patents?

1          MR. KLEIN:  Yes, your Honor.

2          THE COURT:  The number of prior art publication

3     references to ten per patent.

4          And can you do that by April 15th?

5          MR. KLEIN:  Your Honor, if I can confer with my

6     colleagues?

7          THE COURT:  Take a minute.

8          (Pause)

9          MR. KLEIN:  Your Honor, just given some of the

10    discussions that will have to happen with the experts, if we

11    could have until the end of fact discovery on April 30th, we can

12    certainly do it by then.

13         MR. BRAGALONE:  May I, your Honor?

14         THE COURT:  Yes.

15         MR. BRAGALONE:  We specifically asked for a date before

16    fact discovery, so that we could, hopefully, conduct some fact

17    discovery on the narrowed patents.

18         THE COURT:  So, here's the thing.

19         I think it's -- you know, when I talk about limiting

20    the prior art publication references, discovery is not so

21    important.

22         So, I'm going to -- and it is a big chop down -- so,

23    I'm going to go with the April 30th date, and it's just limited

24    to publication references.

25         I would be amenable to cutting down on the numbers of

1    systems at a later point if you don't voluntarily cut down on

2    the number, but it makes sense to me that that be done in

3    conjunction with trying to figure out how you could -- what are

4    you going to do with 1500 products, all right?

5              MR. BRAGALONE:  I understand, your Honor.  Thank you.

6              MR. KLEIN:  Thank you, your Honor.

7              THE COURT:  All right.

8              So, I'm going to sign this one as modified.

9              All right.  Okay.

10             So, the next one -- the next one in my pile is in Case

11   No. 13-2109.  That's, again, LG Electronics and LG Display.

12             LG Display is the one that makes LCMs and LG

13   Electronics is the one that sells the finished products, is that

14   right?

15             MR. BEABER:  Correct, your Honor.

16             THE COURT:  All right.

17             So, there were five topics.

18             This is, again, the plaintiffs' request.

19             The first one is, defendants must offer dates for the

20   30(b)(1) witnesses yet to be disposed previously noticed by

21   plaintiffs.

22             Okay.  So, this is the four persons, who I take, work

23   for LG somewhere who were identified early on as having

24   knowledge about the case according to defendants.  According to

25   defendants, this is when the case was mostly about mobile

1    devices.  The case is now sprawling.  And when 30(b)(6)

2    witnesses were being designated, these people were not

3    designated and they have not otherwise been made available.  And

4    defendant now says their information is redundant.  The 30(b)(6)

5    witnesses.  And the plaintiffs would like to depose them anyhow.

6              Do I have the basic background here?

7              MR. BRAGALONE:  Essentially, your Honor.

8              THE COURT:  All right.

9              So, here's what I'm thinking is, I'm sympathetic to

10   plaintiffs to some degree, which is, they can pick who they want

11   to be 30(b)(1) fact witnesses.

12             And so, the defendants identify these people as being

13   knowledgeable.  And, you know, presumably, being deposed in

14   their individual capacities, they might actually have better

15   information than people who were 30(b)(6) deposed on behalf of

16   the -- whoever designated them.

17             But the one thing is, I take it these people are -- I

18   don't know -- engineers, salespeople?  What kind of people are

19   these?

20             MR. BEABER:  That is correct, your Honor.  They're

21   engineers.

22             If I may quickly?

23             The real concern here is that we put up technical

24   witnesses for 30(b)(6) on all the technical topics.

25             They're not moving for insufficient testimony from the

1    corporate representatives, but now they're trying to get

2    additional duplicative depositions, which I know LG Display

3    brought all the witnesses to the United States at their expense.

4         THE COURT:  Well, so, here's the thing is -- I mean, I

5    think that's one thing where you do get to decide.

6         So, I'm not going to make you bring these people to the

7    U.S., if they're not in the U.S.  They can be deposed wherever

8    they are, because they're just engineers and they're not the

9    official company representatives, all right?

10        MR. BRAGALONE:  Very good, your Honor.

11        We've able to arrange for some, I think, video

12   conference depositions, so --

13        THE COURT:  However --

14        MR. BRAGALONE:  -- we'll work with LGD on setting those

15   up.

16        THE COURT:  All right.

17        So, the order says, within ten days of this order,

18   defendants must offer dates for the 30(b)(1) witnesses yet to be

19   deposed, but previously noticed by plaintiffs.

20        And, I guess, based on what I've said, that would

21   capture what I just said.  You can give them dates within ten

22   days?

23        MR. BEABER:  We should be able to give them dates

24   within that time period, your Honor.

25        THE COURT:  I'm sorry, are you Mr. Beaber?

1          MR. BEABER:  I am.

2          THE COURT:  Okay.  I'm sorry.

3          MR. BEABER:  I can't confirm at this time, on behalf of

4    the client, when those dates would be.

5          THE COURT:  No, no, no, that's all you got to do is, in

6    the next ten days, figure out when those dates would be, and

7    talk to the plaintiffs about it, okay?

8          MR. BEABER:  Understood, your Honor.

9          THE COURT:  The next one is, 30(b)(6) witnesses who --

10   to testify on a number of different topics, which I'm not going

11   to go over, but these are all topics that were in -- in which

12   the Complaint again is the 30(b)(6) witnesses previously put

13   forth were insufficiently prepared?

14         MR. KENNEDY:  That's correct, your Honor.

15         THE COURT:  I did look -- when I was looking through

16   these yesterday, and I'm not prepared to find that any of the

17   30(b)(6) witnesses who were offered -- I'm sorry -- was this the

18   one where the 11 hours of preparation was mentioned for one of

19   these?

20         MS. STREFF:  Your Honor, I think when you look at the

21   fact that Mr. Boyack testified having four separate meetings to

22   prepare for his deposition.

23         THE COURT:  All right.

24         I think we're done.  I've seen that somewhere.

25         So, I'm going to deny this.

1          I think that, as I said, I don't think that I see an

2     insufficiently prepared 30(b)(6) witnesses.

3          So, No. 3.  Oh, this is the spoliation, right?

4          So, the defense response, Mr. Kennedy, is that you've

5     got products, the actual infringing, or allegedly infringing

6     LCMs and BLUs, and why samples of the films, or sheets, or

7     samples of the backlights needed to be preserved and are

8     material to anything.

9          What do you have to say about that, Mr. Bragalone?

10          MR. BRAGALONE:  If I may briefly, your Honor?

11          THE COURT:  Yes.

12          MR. BRAGALONE:  So, from the outset, LGD has stated

13     that the backlights and the backlighting units, that that's all

14     done by their suppliers, and that they don't have information on

15     that.  That they don't have documents produced relating to the

16     actual BLUs, other than the CAD files.

17          We found out, though, during the depositions that the

18     reason that they don't have anything to produce that shows what

19     the backlight units were that they approved.

20          So, they just don't stick a backlight unit in their

21     product and bless it without testing it.  They do testing.  They

22     get samples.  They actually have to approve them.  They know

23     what backlighting units they have approved to go into their

24     products.

25          That is a critical aspect of this case that LG has told

1     us repeatedly that they don't have information on.

2     THE COURT:  Well, I thought they knew what went into

3     their products, because that's how you got this cross-reference

4     between their products and the LCMs, right?

5     MR. BRAGALONE:  Well, in terms of actually producing to

6     us something that would show what is in the products, the actual

7     BLU, they've said, no, you have to go buy that.

8     Well, we found out that the reason that they don't have

9     it is because they've been throwing them away.  And multiple

10     witnesses testified not only do they throw them away, but they

11     also answered a question, "Were the employees of LGD directed to

12     keep samples of backlights that they received from their

13     suppliers after this lawsuit was filed?

14     "Answer:  No.  No such directions were given."

15     So, there has been systematic destruction of these.

16     Now, LG can't tell us, one way or another, which of

17     these samples actually made it into the products, but the reason

18     they can't tell us that is because they destroyed the evidence.

19     Now, we believe that there should be other documents

20     that show what they received.  So, even if they destroyed the

21     actual BLU, surely they tested it when they received it, and

22     they may have the testing documents still available.

23     If we have the testing --

24     THE COURT:  And the testing documents would show what?

25     MR. BRAGALONE:  The testing documents would show the

1    pattern of deformities, perhaps, your Honor.

2           And, again, if we had the actual BLU, we'd be able

3    to --

4           THE COURT:  And the pattern of deformities is what

5    you're figuring out when you tear down these things, and your

6    expert does whatever your expert does with them, is that right?

7           MR. BRAGALONE:  Among other things, your Honor.

8           That's correct.

9           THE COURT:  All right.

10          MR. BRAGALONE:  And so, what we're asking, we're not

11   asking for an adverse inference instruction.  We're asking for

12   some additional discovery relating to what it was that was

13   destroyed.

14          It may very well be what LG Display has told us is that

15   this wasn't that big a deal.

16          But to us it does seem like a potentially very big

17   deal, especially when this is the exact thing that we've been

18   asking for repeatedly to be produced.

19          And remember, your Honor, directed them to ask their

20   suppliers to provide samples to us, and they sent out requests

21   to their suppliers.

22          THE COURT:  I remember, because Ms. O'Byrne sent me a

23   letter with some copy of something a few months back.

24          MR. BRAGALONE:  That is correct, your Honor.

25          So, they say they have satisfied the request to send

1    out letters to their suppliers regarding samples.  What we

2    didn't know and we found out for the first --

3         THE COURT:  I don't think it was about samples.  It was

4    about something else.

5         MR. BRAGALONE:  I believe Ms. O'Bryne's letter was a

6    slightly different issue.

7         I do apologize.  It escapes me right now.

8         THE COURT:  Yes, yes, it escapes me, too.

9         MR. BRAGALONE:  But the Court did, though, direct each

10   of the defendants to ask their suppliers, if the suppliers would

11   cooperate in providing samples.

12        THE COURT:  I think that's -- I'm not sure "samples" is

13   the right word, but I certainly remember that the gist of it was

14   because Lenovo and VIZIO were saying that they didn't have, or

15   some of the defendants were saying they didn't have any

16   technical documents.  I think it was the technical documents

17   that you were trying to get, right?

18        MR. BRAGALONE:  Yes.  And that would include,

19   obviously, if they had the actual samples of what went into the

20   products.  That would cut across quite a few things.

21        So, instead, we were then forced to go out in the

22   marketplace and purchase what we could, but, if they had these

23   actual samples that they could have provided to us, we believe

24   that's absolutely material evidence.

25        And what we're trying to find out is, what information

1     do they have about what it was they did receive, so they were --

2          THE COURT:  Well, I guess what I don't understand is,

3     you got, as opposed to some kind of sample -- and from what I

4     saw, it seemed to me that the samples were something less than a

5     hundred percent guaranteed to end up in the final product --

6     you know, here you actually got the final products with the

7     actual thing that's in them.

8          Isn't what you have better than what you would have if

9     they still had these samples?

10         MR. BRAGALONE:  Well, yes and no, your Honor.

11         For many of the products, our claim charts rely on the

12    CAD files that they produced to us.  And we believe that the CAD

13    files, along with testimony from the witnesses, that we'll be

14    able to present a viable claim of infringement.

15         But we don't have here, obviously, and obviously we

16    haven't been able to purchase every single one of 1500 products,

17    but we have CAD files.

18         If we had samples of products that would show the BLUs

19    that actually went into numerous products, that would supplement

20    what we already have.  It's certainly material evidence in our

21    view.

22         And what we're trying to understand is, what do they

23    still have, and do they have documents?  Perhaps they have

24    photographs, perhaps they have testing that they would have done

25    of these.  And there probably are documents that show which ones

1    were approved to go into various products.

2          So, they should no, because, after all, they have to

3    approve them, which ones they approved to go into the various

4    products.

5          But rather than have a search for a needle in a

6    haystack, we didn't know that they actually had examples of what

7    was in the system, and what would have been approved.

8          So, LG knows which ones they approved to put in the

9    products.  And, clearly, they did approve certain samples to put

10   in the products.  Otherwise, there wouldn't be products that

11   have back-light units in them.  They had to approve those.

12         But what they destroyed is the evidence of which -- of

13   what samples they approved, but there may be documents.  And in

14   fairness, your Honor, there may be documents that help us get

15   over the fact that the underlying evidence is no longer there.

16         But LG has refused to produce any documents,

17   whatsoever, that relate to their review of these, their testing

18   of them, photographs that were taken of them of approvals,

19   approvals that were made.

20         They're telling you say, well, we don't know whether a

21   particular product sample that we received went into various

22   products.  There's no actual evidence of that.  There was a

23   statement made.  It's not supported by any Declaration.  It's

24   not supported by any evidence.

25         THE COURT:  What's not supported by any Declarations?

1          MR. BRAGALONE:  The statement that LGD doesn't know

2    which samples of the destroyed samples they approved to go into

3    their products.  I find that hard to believe.

4          And there is no evidence that we have no Declaration

5    from any witness saying those were just experimental products.

6    Those were tests that we were doing for products in the year

7    2020, which we don't have anything like that.

8          And, in fairness, I think the reason they can't tell us

9    what the details are is because the evidence of what it was is

10   no longer with us.

11         So, we're asking for very focused discovery.  I want to

12   be clear.  We're asking for focused discovery and it is in our

13   order.

14         In their response they don't actually address what we

15   were asking for.

16         They say, oh, we didn't spoliate that stuff, how dare

17   you accuse us.

18         And we're saying, well, let's get to the bottom of what

19   actually is missing.  Let's ask for -- and in our order we asked

20   for very specific things as to what we wanted in the way of

21   information.

22         THE COURT:  Well, I'm not sure how specific it is, but

23   I see what your Order says.

24         All right.

25         Well, why don't I hear from the defendants?

1            MR. BRAGALONE:  Thank you, your Honor.

2            MR. BEABER:  Thank you, your Honor.

3            So, I think there's a number of issues here.

4            Samples were never requested from third parties.  I

5    think it was documents.  That's why I think your Honor got that

6    right.

7            With respect to approved BLUs, et cetera, they have our

8    specifications for approval.

9            With respect to their claim of destruction of samples,

10   none of the samples that they're talking about went into any of

11   the accused products.

12           The testimony that Mr. Bragalone is referring to is

13   very clear that it's talking about ██████████████     Those

14   don't go into products.

15           THE COURT:  Okay.  Now, I don't remember seeing any

16   testimony about ██████████████

17           What are you citing to, exactly?

18           MR. BEABER:  The testimony.  And I believe that Mr.

19   Bragalone was referencing -- it is Mr. Kim's testimony.

20           And he says, "Well, since I've seen only the portions

21   where ██████████████ -- and he goes on to talk about the

22   ████████ in the samples.

23           THE COURT:  Hold on a minute, Mr. Beaber.

24           Now what you're citing to me, I would have to go back

25   to the original deposition to find that?

1          MR. BEABER:  Yes.  It's the transcript on Page 79,

2     starting on Line 3.  And the testimony goes on -- and Mr.

3     Kennedy is questioning:

4          "That's fine.  Can you just draw the example of a

5     defect that you've seen?"

6          And the testimony continues on about defective samples.

7          The fact of the matter is, it's the approved versions

8     that go into the products that have the specifications for

9     approval.  And they can purchase the products that are out

10    there.

11         LG hasn't destroyed --

12         THE COURT:  So, what does LG do with these samples?  Do

13    they destroy them after a certain period of time?

14         MR. BEABER:  For the defective ones, yeah.  They look

15    at the defect to see if it's something in the design or if it is

16    a component part that's defective, and --

17         THE COURT:  So, the citation here in the plaintiffs'

18    letter was to the depositions that are they're calling the Moon

19    deposition, which is a different individual than the Kim

20    deposition where, where they quote:

21         "Question:  What happens to the samples in the films

22    and sheets?

23         "Answer:  They're being thrown away to my

24    understanding."

25         MR. BEABER:  Yes.  And earlier in that testimony, it

1    defines those defects occurring at Lines 5 through 7.

2              THE COURT:  What page?

3              MR. BEABER:  It is 76 at Line 5.

4              THE COURT:  Okay.

5              And so, my recollection from looking at what the

6    plaintiffs submitted -- and I could be confusing this with one

7    thing or another -- but, for the most part, they submitted very

8    focused attachments from depositions.

9              This Page 76, Line 5, is that what they provided me?

10             MR. BEABER:  I don't know.  But I have the testimony

11   right in front of me if you would like to take a look at it?

12             MR. BRAGALONE:  It is what we provided, your Honor.

13             THE COURT:  Okay.  All right.  All right.

14             Well, you usually highlight helpfully in yellow, so

15   sometimes I look above and below to see what it is exactly -- to

16   look for context, but I just don't remember seeing this one.

17             And, I mean, I've looked at it, but I would like to see

18   what Mr. Beaber is pointing me at.

19             MR. BRAGALONE:  We do have a response to that when Mr.

20   Beaber has completed.

21             (Pause)

22             MR. BEABER:  Did you want to see the testimony from Mr.

23   Kim as well on this issue?

24             THE COURT:  Let me look at this first.

25             (Pause)

1          All right.

2          So, I just read through what I take to be Page 76, Line

3     1 to Page 78, Line 5 of the Moon deposition.  It seems kind of

4     confusing, honestly.  Maybe you had to be there.

5          The samples, whether they're defective or not, they're

6     all being thrown away, right?

7          MR. BEABER:  The defective ones are thrown away.  Those

8     are the only samples that they get.  And we confirmed that those

9     don't go into the any of the accused products.

10          THE COURT:  And so, the only samples they get are

11     defective samples?

12          MR. BEABER:  The only samples that they get from their

13     suppliers are ones that have defects in them, yes, and those

14     necessarily don't make it into the consumer product.

15          THE COURT:  All right.

16          Hold on a minute.

17          Oh, I see.  Oh, I see.

18          MR. BEABER:  And I think --

19          THE COURT:  So, what you're relying on, Mr. Beaber, is

20     I guess at Page 76, Line 1, where it appears to be:

21          "Question:  Before we look at this document, as part of

22     your job, do you receive physical samples of the films and

23     sheets that you are -- that you position?

24          "THE WITNESS:  Not always so.  What I could, or I might

25     receive such when there is a defect occurring in order to

1    analyze defect."

2              MR. BEABER:  Correct.  And Mr. Kim goes into more

3    detail on this issue.

4              THE COURT:  All right.

5              It appears to me that you've handed Mr. Kim's -- an

6    excerpt of his from, coincidentally, also Page 76, Line 21 to

7    Page 77, Line 24.

8              MR. BEABER:  And I think I have his testimony going

9    from 79 to 80 as well, which continues in more detail.  I only

10   have that in this version.

11             THE COURT:  Hold on a minute.

12             (Pause)

13             All right.  All right.

14             So, what you're saying is, based on the deposition

15   testimony primarily of Mr. Moon, that what LG gets are defective

16   backlight units, because if they're not defective, there's no

17   reason for them to be looking at them?

18             MR. BEABER:  And they would comply with the

19   specifications for approval that have been approved that

20   plaintiffs have.

21             And so, if there is not a problem with the

22   manufacturer, then they don't get any products.

23             THE COURT:  All right.

24             So, I understand what you're saying.

25             Mr. Bragalone, you said you had something that you

1    wanted to say in response.  Why don't I hear what that is.

2            And if there's other stuff you want to say, I'll give

3    you a chance after he's finished.  I just want to try to figure

4    this one out.

5            MR. BEABER:  Sure.

6            THE COURT:  Mr. Bragalone.

7            MR. BRAGALONE:  Yes, I'll restrict my comments just to

8    this one point.

9            So that's actually very different, the take on the spin

10   that Mr. Beaber is putting on this, from the actual sequence of

11   questioning.

12           If you look in advance of Page 76, on Page 75, he is

13   being asked about pictures, whether he has ever seen any

14   pictures, as in photographs, of the patterns of the backlight

15   panels.

16           And then he says, "Yes, I have seen portions of the

17   patterns on the LGD, which defect happened."

18           And so, the pictures that he's talking about were

19   pictures of defects that he has seen.

20           And then that proceeds down to Line 20, where he's

21   talking about defects and the pictures that he's seen.

22           Then Mr. Kennedy moves to a different question, a

23   different line of questions.

24           And he starts with -- and then he starts talking about

25   samples -- I'm sorry -- I misspoke.  It's the Kim deposition,

1    not Moon.

2            THE COURT:  Oh, okay.

3            MR. BRAGALONE:  Mr. Kennedy helpfully corrected me

4    there, but it's the same page that your Honor has been looking

5    at.

6            So, at Line 20 of the Kim deposition, Mr. Kennedy goes

7    into this different line of questioning.

8            "Does LGD ever receive samples of light guide panels

9    from its suppliers.

10           "It has received samples of light guide panels from

11   backlight suppliers.

12           Then he was asked:

13           "Does LGD receive a sample of every backlight that it

14   purchases from backlight suppliers?"

15           So, now these he's talking about samples of backlights

16   at the purchasing stage.

17           "It does not receive a sample of every backlight.

18           "Can you estimate the percentage of samples that LGD

19   receives?

20           He says he's not certain.

21           For more than 50 percent of the edge lit backups,

22   there's a backup, because he's not certain to that.

23           At no point does he say, well, we only receive samples

24   of defective products.

25           Indeed, that's really contrary to the line of

1    questioning and the testimony here.

2          THE COURT:  All right.

3          I'm sorry, Mr. Bragalone, is there anything more you

4    want to say?

5          MR. BRAGALONE:  Well, the first time we've heard this

6    spin on this was just now, your Honor, and that's why we needed

7    this additional discovery.

8          THE COURT:  All right.

9          Mr. Beaber, I said I would give you a chance to address

10    anything else.

11          Is there anything else you want to address?

12          MR. BEABER:  My only point would be, this testimony was

13    elicited based on their questions.  It's clear that it all deals

14    with defective samples.

15          The fact that they're just hearing this for the first

16    time, they were at the deposition.  Frankly, I don't know how

17    this is construed as reading all the testimony on this issue.

18          I don't know how they bring this to an issue that

19    doesn't deal with defective merchandise.  That's ultimately what

20    transpired.

21          And if the point is, they want the versions that go

22    into the end-use product, they can purchase them in the

23    marketplace.  They have the specifications for approval.  There

24    aren't samples that LG gets of non-defective merchandise,

25    because it comports with the specifications for approval.

1            And one final comment, Mr. Bragalone said at the outset

2    that -- that no instructions were given to LG Display and

3    individuals to retain materials for this case.

4            That's absolutely incorrect.  There's retention.

5            THE COURT:  Well, I saw in your letter or somewhere, I

6    saw that there had been some instructions.

7            MR. BEABER:  There's a standard retention policy that

8    goes around to all the LG Display employees.  And they get those

9    materials and they understand, at the outset of the case, that

10   this policy is in place.

11           THE COURT:  I'm curious in a case like this, who gets

12   it, and what are they told to retain?

13           MR. BEABER:  So, there is not a specific litigation

14   hold, per se.  There is a general format that goes around that

15   identifies just the products at issue in the case and they're to

16   retain all materials.

17           So that --

18           THE COURT:  Is it something as the products go from,

19   you know, 1300 products to 1500 products, do they keep getting

20   new updated lists of products?

21           MR. BEABER:  No, it lists classifications of products,

22   so it doesn't list the specific --

23           THE COURT:  You mean like laptop computers and things

24   like that?

25           MR. BEABER:  Yes.

1          THE COURT:  All right.

2          Anything else, Mr. Beaber?

3          MR. BEABER:  No, your Honor.

4          THE COURT:  All right.

5          I have to say, I'm not in a good position to say what

6     exactly Mr. Moon and Mr. Kim were testifying about in their

7     depositions.  There certainly seems to be some material that

8     either side could argue to support its understanding of what was

9     being said.

10         But I think that given what I understand to be the way

11    this case is actually going to be proved, and given where we are

12    in the state of discovery, and the number of products that are

13    at issue, it appears to me that this discovery is essentially a

14    sideshow to the main needs of the case.  And I am not convinced

15    at all that the -- that there is any likely benefit to this

16    discovery.

17         So, I'm going to deny No. 3.

18         MR. BEABER:  Thank you, your Honor.

19         THE COURT:  All right.

20         Let's go on to No. 4, which is advertising and

21    marketing materials including PowerPoint presentations mentioned

22    in the 30(b)(6) witness testimony and profit information on a

23    product-by-product basis.

24         And so, I believe this was -- so, there's -- the part I

25    wrote down here is, I think it's Docket Item 277-12 at 4.

1          "LG Display tracks profits of its products on a
2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮        basis."
3          I think I can tell from my notes that somebody said
4    this in a deposition, right?
5          MR. KENNEDY:  That's correct, your Honor.
6          MS. STREFF:  Your Honor, if I may?
7          Later in the transcript, Mr. Kim said -- and this is
8    Page 96, Line 20.
9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  because we
10   don't function" --
11         THE COURT REPORTER:  I'm sorry.  I'm not getting that.
12         THE COURT:  All right.
13         So, first off, you're Ms. Streff, right?
14         MS. STREFF:  Yes, your Honor.
15         So, what you're referring to earlier in the transcript,
16   I believe on Page 95, but if you go down to Page 96, starting at
17   Line 20, Mr. Kim testified:
18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  because we
19   don't function our sales -- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  on
20   the customers's orders."
21         So, arguably --
22         THE COURT:  I'm sorry, Ms. Streff, let me just
23   interrupt for a second.
24         These LG witnesses, Mr. Kim and Mr. Moon, are they
25   testifying in Korean in English?

1          MS. STREFF:  They're testifying in Korean with a

2     translator.

3          And, your Honor, just to be clear, there were two Mr.

4     Kim witnesses.  This is a different Mr. Kim.

5          THE COURT:  Okay.

6          MR. STREFF:  And so, your Honor, LG has produced its

7     cost and sales information from 2012 to 2015, on a

8     product-by-product basis.

9          THE COURT:  All right.

10         Mr. Kennedy?

11         MR. KENNEDY:  I think that representation is correct.

12    I think the issue is partly that there is a lot of years missing

13    from before 2012.

14         THE COURT:  Well, didn't the question of at least one

15    of these defendants -- and I'm guessing it might have been LG,

16    we had this dispute months and months, if not a year ago about

17    an earlier point in time where LG said it didn't keep the

18    records of -- or there was reason why LG seemed to have trouble

19    producing this information at an earlier point in time, that

20    that was this particular defendant, right?

21         MS. STREFF:  Yes, your Honor.

22         And here what they're asking for, though, is the

23    profits information, not different years.  And that profit

24    information can be calculated by plaintiff in view of the cost

25    and sales information that was produced.

1          So --

2          MR. KENNEDY:  And I think that cost and sales

3     information was produced not on a specific LCM basis, but on

4     just a products category -- a product category basis of

5     televisions.

6          THE COURT:  Okay.  Wait, wait, wait.

7          Are we talking LG Display or LG Electronics here?

8          MR. KENNEDY:  LG Display.

9          MS. STREFF:  LG Display.

10         THE COURT:  Okay.  So, presumably, LG Display is the

11    maker of LCMs.  We're talking profits -- we're talking costs,

12    sales, and profits, which could either be -- okay.

13         So, we're talking about LCMs.

14         Ms. Streff and Mr. Kennedy, for at least from the year

15    of 2012, to the present, you have -- the plaintiff has received

16    the basic finances of these different LCMs; that is, essentially

17    what they're sold for and what their cost is?

18         MR. KENNEDY:  My understanding is that's only for the

19    product category.  It's not for the specific will LCMs.

20         THE COURT:  And by "product category," you mean what?

21         MR. KENNEDY:  Television versus laptop.  Instead of an

22    LCM file number, an LCM file number --

23         THE COURT:  But I guess what I don't understand is,

24    when you say product categories, because it's a different kind

25    of LCM that goes into TVs than in the laptops?

1          MR. KENNEDY:  Different models, yes.

2          THE COURT:  Ms. Streff, what do you have to say about

3     this?

4          MS. STREFF:  Your Honor, we still stand by the fact

5     that LG Display has produced the cost per sale on a

6     product-by-product basis, and that's the information that they

7     can use to calculate the profit.

8          THE COURT:  Well, so when you say "product-by-product,"

9     let's say there's an LCM that has the Model No. 1,2,3.

10         Does the information provided have the cost and sales

11    for the LCM 1,2,3?

12         MR. BEABER:  Well, it is on an LCM specific -- LG a

13    Display that is the manufacturer of television, so there's --

14         THE COURT:  Well, even though what I understand Mr.

15    Kennedy to be saying is, yeah, I think -- tell me if I'm wrong,

16    Mr. Kennedy is -- LG Display doesn't manufacturer televisions,

17    but they manufacturer LCM, one LCM for a television, and another

18    LCM for a laptop, and another LCM for some other kind of device.

19         And what you seem to be saying is, all the LCMs that

20    are manufactured for laptops, that's one category.  That's how

21    it's broken down.

22         All the LCMs that are manufactured for TVs, that's a

23    different category.

24         And things -- you know, if there are ten different LCMs

25    they make for TVs, they're not broken out by the ten different

1    LCMs?

2         MR. KENNEDY:  That's correct.  And that is specifically

3    for cost information.

4         So, we have revenues on a LCMs -- on an LCM basis, I

5    believe, but we don't have the cost information.

6         THE COURT:  Okay.

7         MR. KENNEDY:  Cost information is broken down by

8    product category, like televisions and laptops.

9         THE COURT:  I understand generally what you're saying.

10        MR. BEABER:  I think he's correct, but that's all the

11   data on LG Display.  LG Display has produced information, how

12   they have it in the ordinary course of business.

13        I think there is some confusion as to the manufacturing

14   process and how you -- what cost system you utilize.

15        And I think with respect to LG Display, we provided the

16   cost data as they viewed it in their system.  I think what

17   they're talking about is possibly going back to like cost cards,

18   independent cost cards, which is impossible.

19        THE COURT:  Right.

20        MR. KENNEDY:  And so, I think that goes back to the

21   witnesses testimony, to Exhibit K to the LG brief.

22        And we asked, "Does LG Display keep track on a

23   ███████████████████████

24        This is Page 95 of Exhibit K at Line 24 of the witness.

25        "Do you mean to ask me if LG Display ████████████

1    ███████████████████████

2            "BY MR. PERKINS:  Yes.

3            "Answer:    ████████████

4            So, they testified that they tracked --

5            THE COURT:  I'm sorry.  A ███████████████████

6    █████████████████████████████████

7            MR. KENNEDY:  ████████████████████████

8    ███████████████████████████  They sell these products

9    individually as LCMs.  Not as a whole category.

10           THE COURT:  All right.

11           Hold that thought.

12           Mr. Kennedy, so, this part of the deposition he's

13   quoting, is he misunderstanding it?

14           MR. BEABER:  Yes.  Well, I think what he's representing

15   is that we have profit information that draws on some costs

16   other than the costs of --

17           THE COURT:  Well, before we get to profit information,

18   I think one step before that he's saying that your witness said,

19   you have ████████████████████████████

20   basis.

21           That's what he's saying Mr. Kim said about tracking it

22   on a product-by-product basis?

23           MR. BEABER:  I don't think that's correct, your Honor.

24           I mean, the data that we produced is the data that they

25   have in their systems.

1           If he's construing that testimony that way, I guess my

2    question would be, what document did he show them?  Did he show

3    him the sales data that we've produced?

4           Because that's the sales data that -- and the cost data

5    that he would be referencing in that testimony.

6           THE COURT:  So, just to make sure I have your position

7    straight, Mr. Beaber, if LG Display can tell you how many units

8    of an LCM 1,2,3 they sold, and what the price was that they sold

9    that at, ███████████████████████████████████

10   ████████████████████████████████████████████████ is

11   that right?

12          MR. BEABER:  That's right.  I mean, it's a matching

13   system, so you can't say that this LCM costs X amount to use.

14   Raw materials are used for a bunch of different LCMs.

15          So, there could be 14 different models that use the

16   same component units.  And when you're doing a batch costing

17   system, you use these costs that are used on a bunch of

18   different models, not just one.

19          You don't use a -- for example, a sheet of glass.  You

20   cut that sheet of glass in the most efficient ways, so you might

21   have three 42-inch --

22          THE COURT:  Mr. Beaber, I think I've heard you or

23   somebody on your side say this kind of thing before.  That's why

24   I'm starting to get the hang -- the gist of it.

25          If it's the case -- is it the case -- well, first off,

1    in the end, what we're trying to do here is figure out some

2    numerical input for plaintiffs damages expert, right?

3            MR. KENNEDY:  Correct, your Honor.

4            THE COURT:  So, is it the case that based on the

5    information that you have provided, Mr. Beaber, that one could

6    figure out what the average profit on a LCM is, and then just

7    take that for whatever particular categories of LCM are at

8    issue, and there would be no dispute by you that that's a

9    reasonable way of figuring out the profit on each particular

10   LCM?

11           MR. BEABER:  That's what our expert is going to have to

12   do, and I assume that's what their expert is going to do, and

13   that's what we'll put in our letter.

14           THE COURT:  Does that solve your problem?

15           MR. KENNEDY:  I think so, except for the pre-2012

16   issue.  I think if their witness is testifying that they track

17   ██████████████████████████████████████████

18   ███████████████████████████  that it would be easy if we just got

19   that information.  I understand that they're not saying that

20   doesn't happen, so I don't know how we would do that.

21           THE COURT:  Well, before the 2012, while the details

22   are hazy, my impression is that an earlier point in time that I

23   said to LG, for lack of better words, try harder, in the face of

24   their saying, we didn't keep -- we didn't keep exactly what it

25   was that you were looking for.

1          I assume that nothing that I've heard about what the

2     witnesses said makes me think that what LG told me earlier was

3     incorrect, right?

4          That that witness was just talking generally about --

5     without saying, well, in 2009 we did this, and in 2013 we did

6     that, right?

7          MR. KENNEDY:  I believe that's correct, your Honor.

8          THE COURT:  So, I guess, Mr. Kennedy, what is it that

9     you are asking me to ask LG to do that I could do that is not

10    something that I haven't already done, and would likely produce

11    a different result?

12         MR. KENNEDY:  I think the agreement is fine.

13         I just think that it's difficult for us to swallow that

14    LG Display does not track the cost information of its products.

15    I don't know how --

16         THE COURT:  Well, I mean, at least for the more recent

17    years, they're saying they do track the costs.  They just don't

18    -- they say that for the reasons Mr. Beaber just said, we get a

19    bunch of raw materials in, and so, you know, my main concern, or

20    a concern, not my main concern is to make sure, or not even to

21    make sure, but to give you a fair chance to put forth a damages

22    theory based on reasonably reliable evidence.

23         And based on what Mr. Beaber has said, as well as

24    common sense, I think you've got that for at least 2012 and

25    forward.

1            What you have before that, I don't know, but I don't

2   think these depositions, at least so far as anything I've heard

3   or I remember reading, that there's anything in particular more

4   I can do for you?

5            MR. KENNEDY:  I think that the stipulation that you

6   mentioned earlier is sufficient for plaintiff, and also suggests

7   a Declaration from defendant, or from LG Display, that that

8   profit information does not exist, so we can clear up the

9   testimony in the deposition.

10            THE COURT:  All right.

11            Mr. Beaber, it wouldn't be too hard for you to get such

12   a Declaration?

13            MR. BEABER:  No, sir.  It's not a problem, your Honor.

14            THE COURT:  All right.

15            Well, why don't you get that Declaration, because I

16   think it would tie up some loose ends.

17            MR. BEABER:  Sure.  Just to clarify, I'm assuming that

18   the plaintiffs, with respect to the sales data, are citing to

19   the spreadsheet, that there is both ████████████████████

20   ██████████████████████████████   in there.  And I want to give the

21   exact reference here.

22            It's LGEIDT001 --

23            THE COURT REPORTER:  I'm sorry, Mr. --

24            MR. BEABER:  Just so we're on the same page, so there

25   is no confusion about what information, because I am looking at

1    a spreadsheet that is Bates labeled LGEIDT0011004.  And it's the

2    2012 to 2015.  It has sales ████████████████████████████

3    ████████████████████████  And I'm assuming that's the

4    document that the plaintiffs are referring to.

5           And I think with the data in that document, they should

6    be able to calculate the profit information.  And we will

7    obviously get a Declaration that ████████████████

8    ████████████████████████████████████████  of LG

9    Display.

10          MR. KENNEDY:  And I take it from the specific document

11   right now that -- I don't see how --

12          THE COURT:  Well, why don't you, when I take a break,

13   you can talk some more about specific things.

14          But I'm just going to write down here on this Order, LG

15   will produce within two weeks?

16          MR. BEABER:  That's fine, your Honor.

17          THE COURT:  A Declaration about -- if I said about it's

18   ████████████████████████████  models from 2012 to the

19   present?

20          MR. BEABER:  I think it's profit information that they

21   wanted the --

22          THE COURT:  Okay.  Profit information.

23          MR. BEABER:  Profit information.

24          THE COURT:  Mr. Beaber, just tell me, LG will produce

25   within two weeks a Declaration about what, profit information?

1          MR. BEABER:  That they ██████████████████

2    ██████████████████████  in the ordinary course of business.

3          THE COURT:  About not tracking profits...

4          MR. KENNEDY:  Or costs.

5          MR. BEABER:  Well, there's cost information in that

6    spreadsheet that we're just talking about.  And I think there's

7    ████████████████████████████████████████████████████████████

8    ██████████████████████████████████████████

9          MR. BRAGALONE:  But that's what we're trying to get the

10   Declaration on, that they don't have cost information on a

11   product-by-product basis.

12         MR. BEABER:  I think you need to look at LGEIDT0011004.

13         THE COURT:  And what you're saying is, Mr. Beaber, if I

14   understood you right is, even though you don't track on it a

15   product-by-product basis, this particular spreadsheet

16   essentially, not arbitrarily, but essentially divides up the

17   costs over products on a product-by-product basis.

18         MR. BEABER:  Which is what you would have to do with

19   the batch system, I think, to the point of where somewhere

20   overall costs are tracked.  Now, this is how they track them and

21   their allocations that they would use in the batch costing

22   system.

23         THE COURT:  All right.

24         So, what I'm going to write here is, LG will produce

25   within two weeks a Declaration about how it ████████████████

1    █████████████

2            MR. BEABER:  Yes, I think the fact is,  ███████████

3            THE COURT:  Okay.  All right.

4            For a minute there I lost track of which one of these

5    we were talking about.

6            There was also the additional PowerPoint presentations

7    mentioned in a 30(b)(6) witness's testimony.  And, as I recall,

8    the witness said something like more than ten PowerPoints he had

9    seen, and the production of PowerPoints by LG has been exactly

10   one, and LG representing that's all the PowerPoints they have.

11           MR. KENNEDY:  LGD said they produced all the relevant

12   marketing materials.  They've only produced one marketing

13   material.

14           I think there's additional PowerPoint documents that

15   have marketing materials.  I think there's also other documents

16   that are marketing materials, such as the website history.

17           I'm looking at an exhibit from one of our depositions

18   on the website history, the website LGD, and it's a notebook

19   display that ultraslim, the most important features for portable

20   PCs are lightweight, slim design and low power consumption.

21           I think it's difficult to say that they produced all

22   relevant marketing documents when they haven't produced the

23   history of their website, which advertise the documents -- or

24   advertise the products.

25           THE COURT:  Anybody, Ms. Streff?

1          MR. KENNEDY:  There are two issues.

2          The PowerPoints, and there has to be other marketing

3     documents.

4          MS. STREFF:  Your Honor, I'll start with the PowerPoint

5     presentations.

6          So, the testimony here comes from Mr. Im and --

7          THE COURT:  Not to be confused with Mr. Kim or Mr. Kim?

8          MS. STREFF:  That's correct.

9          THE COURT:  Right.

10         MS. STREFF:  It will tend to kind of explain what LG

11    Display does with these marketing presentation and how they come

12    about.

13         And some of that comes from Mr. Im's testimony.  Some

14    of that was in a follow-up to get the full picture.  And I think

15    that will help understand why we've only produced the one

16    relevant non-duplicative marketing presentations relevant to

17    LG's product.

18         So, what we produced is the LG Display approved

19    internal marketing presentation related to their LED technology.

20         So, this presentation was created and approved, and

21    each of the customer reps used the approved presentation, and

22    they pull from that.

23         So they made it a subset.  They made the whole thing.

24    They made the portion.  They are confined to the internal

25    presentation that LG has created.

```
 1              And then there are customer reps for each significant,

 2      or for each customer product category; the TV, mobile monitor,

 3      and then for each reason.

 4              So, there are a lot of customer reps and they're all

 5      flowing from this same presentation.

 6              And, now, Mr. Im testified that there's no system where

 7      these things are stored.  They may be sent via e-mail through

 8      the customer reps.  But there is no system, no database where

 9      this customer -- the pared-down versions are saved.

10              But what we've produced is the internal

11      all-encompassing marketing presentation that relates to LEDs.

12              THE COURT:  So, what you're saying is, everything else

13      that anybody receives is a subset of this?

14              MS. STREFF:  That's correct, your Honor.

15              And another piece is --

16              THE COURT:  And did Mr. Im, when he was testifying,

17      explain what you're now explaining?

18              MS. STREFF:  So, he provided testimony on that one

19      presentation.

20              And I guess it was never asked, is this an internal

21      presentation, but the presentation, itself, has internal notes

22      that are in Korean.  And so, he might have went through it and

23      translated the internal notes.  And those were notes to the

24      customer reps.

25              So, his testimony -- he does give testimony that there
```

1    are internal notes on the presentation, and they're directed to

2    the customer reps in creating their presentation.

3            THE COURT:  But the bottom line is -- what you're

4    saying is, I may have seen ten different marketing

5    presentations, but they're all subsets of this internal approved

6    presentation?

7            MS. STREFF:  That's correct, your Honor.

8            I mean, there is no follow-up on these different

9    presentations.

10           THE COURT:  All right.

11           So, Ms. Streff, let me just see.

12           Mr. Kennedy, you're responding to this.

13           What do you have to say?

14           MR. KENNEDY:  I think it's hard to believe that LG

15   Display has one marketing document over the past eight years

16   that it uses, I think -- I'm guessing here.  But it must have

17   been 60 pages long, and it was the same presentation broken up

18   into different levels of detail.

19           I don't know.  I don't see how it's feasible that LG

20   Display only has only one marketing document relevant to this

21   case.

22           MS. STREFF:  Your Honor, I think I can help clarify

23   that as well.

24           THE COURT:  Okay.

25           MS. STREFF:  So, the difference here that he's talking

1    about were not -- that was not followed up with Mr. Im.  But I

2    can clarify that from talking with the witness myself.

3             And that this a presentation on LEDs and they're not

4    updated on a regular basis.

5             THE COURT:  Apparently not.

6             MS. STREFF:  It covers a couple years.

7             And so, I can tell you the more recent one is related

8    to the old LED technology.  Old LED products are not accused in

9    this case.  That's not a relevant marketing presentation.  The

10   one that proceeded the LED marketing presentation, related to

11   IPS or in-main switching technology, which is related to the

12   driver circuits.

13            Again, not accused technology.

14            So, the one that is relevant here is the one that we've

15   produced, and that's the only marketing document to the accused

16   products in this case.

17            THE COURT:  All right.

18            Well, in any event, you're representing to me that you

19   have done a reasonable search and investigation, and this is the

20   only responsive PowerPoint presentation LG Display has?

21            MS. STREFF:  That's correct, your Honor.

22            MR. KENNEDY:  I stand by my previous statement.  I

23   don't see how LG Display hasn't updated its marketing over the

24   last eight years.  I find it difficult that a large

25   multinational corporation wouldn't change its advertising points

1     on particular products over eight years.

2              MS. STREFF:  Your Honor, if I made add?

3              LG Display has an established presence in the market.

4     And the fact of the matter is, they don't have to do a lot of

5     advertising.  Their customers come to them.

6              So, that's part of the reason why there is not a lot of

7     information.  And what we have are these PowerPoints.  They're

8     promotional materials to use with customers, but they don't have

9     to go out and do a lot of marketing.

10             And LG Display doesn't sell LCMs to end-users.  So this

11    isn't advertising to end-users.

12             THE COURT:  All right.

13             Well, I'm going to accept counsel's representation, so

14    I believe that means that there is nothing left in Paragraph 4.

15             I've written a separate essential in the Order about

16    the ███████████████████████

17             MR. KENNEDY:  If we could, could we request that they

18    produce the history of their website?  Their websites are

19    advertising these products.

20             THE COURT:  All right.

21             And so, a history of websites, Ms. Streff?

22             MS. STREFF:  Your Honor, I'm not sure what they're

23    asking.

24             That we print out every single website page on LG

25    Display's website?

1          MR. KENNEDY:  Their websites.  It's limited and it's

2     pretty easy to print out their -- I think, during the

3     deposition, they were talking about Mr. Im's deposition.  There

4     may be six pages in total in the LG Display website.

5          And we're talking about the historical, so the changes

6     of marketing on those limited pages that relate to the user

7     technology, you know, not what we can see today, but --

8          THE COURT:  Do they still have the thing called the way

9     back machine?

10          MR. KENNEDY:  I believe so, your Honor.

11          THE COURT:  So, have you gone to check and see yourself

12     how the website might have looked different on this topic for

13     six years ago?

14          MR. KENNEDY:  No, I just used the current internet.

15          But LG Display has those documents.  They're in a

16     better position to produce the correct versions on the way back

17     machine.

18          But we don't know that the decision as to why certain

19     changes were made to the website, why certain features were

20     changed at one time versus another.

21          THE COURT:  Ms. Streff?

22          MS. STREFF:  Your Honor, to me it still sounds like

23     he's asking us to print out our web page and --

24          THE COURT:  Well, he says there is only six relevant

25     pages.  I take it -- I have no idea.  I have not looked at the

1    LG Display website myself.  But I take it it probably has lots

2    of different -- I'm imagining it being like Home Depot, you

3    know, it's got a lot of different categories of things.

4           And so, you go and click on LCD, LED -- I don't know

5    what -- LCM, and maybe it has some -- I mean, do you know what

6    is on the website?

7           MS. STREFF:  Sure.  They used some printouts during the

8    deposition of --

9           THE COURT:  So, explain to me, in a few words --

10          MS. STREFF:  There may be some -- do you have a

11   printout?

12          MR. KENNEDY:  I can show you an example on my laptop.

13          THE COURT:  Okay.  Let's do that.

14          MR. KENNEDY:  May I approach?

15          THE COURT:  Yes.

16          (Pause)

17          So, what you're showing me is that the advertisement

18   for the ultraslim notebook display, and then -- which is

19   something that I guess includes an LCM in it?

20          MR. KENNEDY:  Correct.  I think that's an advertising

21   for the actual LCM that would go in the laptop.

22          THE COURT:  I don't know.  It seems to be notebook

23   display.

24          MR. KENNEDY:  This is LG Display's website, so I think

25   their advertising the products that go inside a notebook.

1            THE COURT:  Ultraslim?

2            MR. KENNEDY:  Yes.

3            THE COURT:  Presale advertising.

4            And, Ms. Streff, the thing -- because I saw Mr. Kennedy

5    showed it to you, and I'm looking at it, is that actually an

6    advertisement for an LCM?

7            MS. STREFF:  I believe it's for an ultraslim laptop

8    that incorporates an LCM.

9            THE COURT:  But this is the kind of thing that you want

10   six is years of history on?

11           MR. KENNEDY:  Well, I think it's -- because I want to

12   make sure that they are incorrect when they represent that they

13   produced all of the marketing documents.

14           THE COURT:  All right.

15           Well, it seems to me that they're of extremely marginal

16   significance.  And you've got the current website.

17           And I don't see any particular benefit to ordering

18   further history, so I'm going to deny that.

19           All right.

20           Then the last thing on the LG -- maybe not the last

21   thing, is inspection of the teardowns that I understand that LG

22   is consenting to this?

23           MR. BEABER:  Yes, your Honor.  We're consenting to it.

24           THE COURT:  Okay.  Then I will include it in the Order.

25           Then the Proposed Order I have then says in No. 6,

1    Lenovo will limit the number of prior art references.

2            So, I assume this is supposed to be LG?

3            MR. BRAGALONE:  That is the typo in the Order, your

4    Honor.

5            THE COURT:  All right.

6            No big deal.

7            So, I'll just write in "LG," and I will conform this to

8    what I've put in the Lenovo Order, which is, by April 30th,

9    limit the number of prior art publication references to ten per

10   patent, all right?

11           And I will sign this order.

12           All right.

13           So, that's two down.  It's five of 11.

14           Why don't we take a ten-minute break or so, and then

15   we'll come back and keep on moving through these.

16           (A recess was taken at 10:54 o'clock a.m.)

17           (The proceedings resumed at 11:09 o'clock a.m. as

18   follows:)

19           THE COURT:  All right.

20           Please be seated.

21           So, we are ready for the LG requests to plaintiff,

22   which there are three.

23           And so, the first one is the documents, which I guess

24   relate to teardowns that were done by Rambus after June 14th of

25   2013.

```
 1                    Who is addressing this for the plaintiff here?

 2                    MR. BRAGALONE:  I will, your Honor.

 3                    THE COURT:  All right.

 4                    So, these documents were at issue in the prior

 5          discovery motion, were they not?

 6                    MR. BRAGALONE:  No, your Honor, not entirely.

 7                    THE COURT:  Well, why do you say "not entirely,"

 8          because I've got Docket Item 145, which is some kind of

 9          Declaration by, I think, one of the attorneys for the

10          defendants.

11                    Paragraph 10 says, "Defendants are contesting the

12          assertion of privileges for control numbers" -- and then there

13          are three citations which exactly match what they are now asking

14          that you produced.

15                    MR. BRAGALONE:  So, first of all, your Honor, the claim

16          charts were not at issue at all.  Those have nothing to do with

17          Rambus and never did.  The subpoena was directed to Rambus.

18          That's how this came -- this issue came to the Court.

19                    So, that's not correct at all.

20                    In fact, even the defendants, LG in their motion says

21          that, well, within the spirit of the Order.  It's not within --

22                    THE COURT:  Well, I thought that it related to the

23          ██████████████   ████████████████   ███████   █████████████

24          █████████?

25                    MR. BRAGALONE:  So, the  ███████████████  , that's
```

1    correct.  It is the teardowns.

2         THE COURT:  Right.  Well, so, what kind of a -- so

3    these things that are the subject of the Proposed Order that are

4    described on the privilege log, and which was produced by

5    Rambus, I agree, what kinds of things are these?

6         MR. BRAGALONE:  So, your Honor, these were two weeks

7    before any litigation was filed.  My law firm hired Rambus as a

8    consultant.

9         THE COURT:  Well, hold on.

10        So, are these the claim charts that were prepared by

11   you or by Rambus?

12        MR. BRAGALONE:  Rambus didn't prepare any claim charts.

13        THE COURT:  Okay.  These were prepared by you?

14        MR. BRAGALONE:  So, the claim charts were done with

15   counsel, and in-house counsel, and █████████████

16        THE COURT:  All right.

17        So, they were prepared by you?

18        MR. BRAGALONE:  We had inputs into them, yes, your

19   Honor, the claim charts.

20        THE COURT:  When you say "in-house counsel," you mean

21   Mr. Lucas?

22        MR. BRAGALONE:  Mr. Lucas among others, I believe, but

23   certainly Mr. Lucas was involved.

24        THE COURT:  So, these are claim charts that are

25   prepared after June 14th of 2013, which Rambus had a copy of,

1     right?

2             MR. BRAGALONE:  No.  I may be -- the Court may be

3     confused a little bit on this and I apologize if I --

4             THE COURT:  Well, you don't need to apologize.  I'm

5     trying to figure this out.

6             There are these three sets of documents which,

7     according to the Proposed Order, relate to the teardowns.

8             MR. BRAGALONE:  And that's my point, your Honor, they

9     don't.  The one is --

10            THE COURT:  Well, so, instead of telling me what they

11    aren't, tell me what they are.

12            MR. BRAGALONE:  So, yes.  So, the ███████████████

13    documents, those were not anywhere on the Rambus log.

14            THE COURT:  No, Mr. Bragalone, I think you're confusing

15    two things or you're telling me they're confusing two things.

16            MR. BRAGALONE:  That is what I'm saying.  They are very

17    much trying to -- their contention is that this Court's Order

18    required the production of Rule 11 materials, required the

19    production of claim charts that were not done by Rambus, and

20    required production of reverse engineering that was not done by

21    Rambus.

22            THE COURT:  Okay.  So, just to make that sure I

23    understand, because I, you know, to the extent that I was

24    looking at this in advance, I agree with, I think, where you're

25    headed, which is what ███████████████████ ████ ████████████

1  ███████████  did that was not covered by my order?

2              MR. BRAGALONE:  That's correct, your Honor.

3              THE COURT:  And what you're telling me is that the

4  things that are -- that Rambus put on its privilege log, were

5  things that were done by ████████████████   ████   ████████████

6  ██████████?

7              MR. BRAGALONE:  No, your Honor.  Those shouldn't on

8  Rambus's privilege log.

9              The only exception is that --

10             THE COURT:  Well, what -- so, there is this reference

11  to control numbers.  I'm just going to read the last six digits.

12  227126-227288 and 227650-262936, and something that's 1 to 93,

13  okay?  Do you know what I'm talking about?

14             MR. BRAGALONE:  And, respectfully, your Honor, if those

15  are control numbers from the privilege log, I would only know

16  that those are entries on the log.  I don't know what it is that

17  it's actually referring to.

18             Rambus had its privilege log, your Honor.

19             I would say from the plaintiffs' perspective -- and I'm

20  not trying to not answer the Court's question, it's just that

21  dealing with these from a control number that refers to a

22  privileged document, and we don't actually pull up the

23  privileged documents and look at them with respect to marrying

24  them to control numbers.  We --

25             THE COURT:  Well, so, presumably, they're Rambus's

1    privilege log and you looked at a copy of that.

2          What does Rambus describe these things as being?

3          MR. SCHLADWEILER:  Your Honor, I think I can clarify

4    some of this?

5          THE COURT:  Okay.

6          MR. BRAGALONE:  I think I --

7          MR. SCHLADWEILER:  Because the --

8          THE COURT:  Whoa, whoa, whoa, hold on a second.

9          Mr. Bragalone, are you about to clarify some of this?

10         MR. BRAGALONE:  Yes.  I believe that they refer to

11   certain of these teardown ports, or reverse engineering.

12         But the distinction is, several of them were done --

13   so, several of them were done after March, so that they

14   basically fall into three categories.

15         There were some that were done before March of 2013.

16   Those had already been produced by Rambus.

17         THE COURT:  Right.  The ones that are before June 14th,

18   I think we've resolved them, because --

19         MR. BRAGALONE:  Right.

20         THE COURT:  -- they're either this first bucket that

21   you produced voluntary --

22         MR. BRAGALONE:  That's right.

23         THE COURT:  -- and the second bucket that you produced

24   after I ordered you?

25         MR. BRAGALONE:  That's correct.

1          THE COURT:  And then there is this third bucket and you

2      are saying -- what are you saying?

3          MR. BRAGALONE:  What I'm saying, your Honor is, those

4      were conducted as a Rule 11 preceding investigation.  There were

5      different circumstances that applied to those.

6          If you actually look at your Honor's Order, and the

7      basis, and the rational for the Order --

8          THE COURT:  Oh, no, no, no.

9          MR. BRAGALONE:  I'm sorry.

10         THE COURT:  Before you get to my Order, I'm trying to

11     figure out what these things are, because they are things that

12     appear on a Rambus privilege log.

13         I assume -- and I'm guessing -- well, all I know for

14     sure is they appear on a Rambus privilege log.

15         I heard you say you don't know what they are.

16         Then I heard you say they are some kind of -- do you

17     know what they are or don't you?

18         MR. BRAGALONE:  I know from the plaintiffs' privilege

19     log that the plaintiffs' have logged these in.  They are part of

20     our Rule 11 investigation that was conducted exactly two weeks

21     before the lawsuits were filed.

22         THE COURT:  So, how did you get on Rambus's privilege

23     log?

24         MR. BRAGALONE:  Because Rambus participated in that

25     Rule 11 investigation as consultants to my law firm on behalf of

1   the plaintiff IDT.

2         THE COURT:  So, what you think these are -- and I'll

3   give you a chance in a second, Mr. Schladweiler -- what you

4   think these are is essentially charts that were prepared by some

5   combination of Rambus, and you, and Mr. Lucas, and maybe other

6   people at Acacia charting various products against the claims,

7   and that this is done after there is some kind of agreement

8   between you and Rambus?

9         MR. BRAGALONE:  So, I would not characterize the Rambus

10  one as claim charts.

11        But, other than that, what your Honor said is correct,

12  because unlike the reports that predated my law firm's

13  involvement, once my law firm became involved, we actually flew

14  to Ohio.

15        THE COURT:  Right.  I read that stuff.

16        MR. BRAGALONE:  Right.

17        THE COURT:  So, were there were a number of things.

18        One of which is, you said -- well, first off, let me

19  just stop you right there before you go.

20        Mr. Schladweiler, you wanted to clarify?  Just stay

21  where you are.

22        MR. SCHLADWEILER:  Sure.

23        THE COURT:  Is there something that you still want to

24  clarify?

25        MR. SCHLADWEILER:  We finally got around to it towards

1    the end.

2        I think Mr. Bragalone was just sort of confusing issues

3    of, you know, what's in our Paragraph 2 relating to █████

4    ████████ ████ ███████ -- █████████████████████ -- sorry, it's a hard

5    word for me -- with the Rambus report.

6        So, what's on the log -- and I can tell you this,

7    because Rambus told us this and it's in our briefing -- it's

8    basically Rambus teardown reports.  It's the physical devices

9    that were actually torn down by Rambus, which we understand are

10   at their facility in Ohio.

11       And, also, the sort of the information that went into

12   these reports; the photographs, the test results, all the

13   factual information that went into these reports.

14       Mr. Bragalone is correct.  There are no claim charts.

15   Rambus never participated in any of the claim charts to our

16   knowledge.

17       THE COURT:  Okay.  So, what you're saying is, Mr.

18   Schladweiler, what you're saying is essentially based on

19   depositions, and whatever else is, these are the raw materials

20   for claim charts that were done presumably by an attorney or

21   somebody connected with either Acacia or --

22       MR. SCHLADWEILER:  No, no.  That's what I'm saying.

23   They're not the claim charts at all.

24       THE COURT:  No, I understand they're not claim charts.

25   I said they were raw materials.

1        MR. SCHLADWEILER:  Right.

2        THE COURT:  They were stuff that was taken into the

3   charts and --

4        MR. SCHLADWEILER:  They were -- I apologize, your

5   Honor.

6        THE COURT:  They were something that was taken by,

7   presumably, attorneys or attorney-related people, and turned

8   into charts, which are separate a group of things, and they're

9   not at issue, right?

10       MR. SCHLADWEILER:  They were never -- it doesn't have

11   anything to do with claim charts.  It has to do with the

12   teardown reports.

13       So, what it is, is the first set, if you look at the

14   Order, the first set which is 227126 through 227288, I believe

15   those are teardown reports.  Those are the finalized teardown

16   reports that we know the plaintiff also have possession of.

17   They logged them as well.  Rambus and plaintiffs logged them.

18       The next item, which is 227650 to 262936, there may be

19   some the teardown reports in there -- I'm not exactly sure --

20   but I know a lot of that is, for instance, photographs that were

21   used in those reports, test results that were used in those

22   reports, so that's what that information is.

23       The next category, which is --

24       THE COURT:  And, I'm sorry, so what you're saying is,

25   you think the first 150 pages is essentially narrative, I mean,

1          it's a written description kind of thing?

2                    MR. SCHLADWEILER:  No, I think it's an Excel

3          spreadsheet, the actual teardown report.  We produced an example

4          of what the teardown reports would look like in our Motion to

5          Compel.  It's one of those pre-2000 -- March 2000 --

6                    THE COURT:  I didn't look at that.

7                    MR. SCHLADWEILER:  No, I understand.  It's a long ways

8          away.

9                    But, basically it has a spreadsheet and it has

10         information in there, measurements and photographs.

11                   THE COURT:  Okay.  And so then, the next thing, which

12         is on the order of -- if these are all consecutive -- something

13         like 35,000 pages, is photographs and -- I don't know --

14         whatever kind of paper is generated when you're doing teardown

15         reports?

16                   MR. SCHLADWEILER:  I believe that's the case, your

17         Honor.  I think some of that might also be teardown reports.

18                   They produced a log.  A big swath of information that

19         was just the information that they used to generate the teardown

20         reports.

21                   THE COURT:  Then the third thing, which appears to be

22         93 pages?

23                   MR. SCHLADWEILER:  That's just the physical devices.

24         So, those are the physical devices --

25                   THE COURT:  Ah.

1          MR. SCHLADWEILER:  -- that Rambus tore down.

2          THE COURT:  Okay.  All right.

3          And just so we don't lose sight of what's going on

4     here, you're not using any of this at trial or your experts are

5     not going to use any of this?

6          This is, basically, as far as you're concerned, stuff

7     you did to satisfy the Rule 11, maybe other purpose, but Rule 11

8     is a good enough purpose, and you never wanted to see the light

9     of day or otherwise be used for any purpose that it hasn't

10    already been used for?

11         MR. BRAGALONE:  That is correct.  It will not be used

12    at all, and has not been used by our experts.

13         THE COURT:  All right.

14         And so, why -- hold on a second, Mr. Bragalone.

15         Mr. Schladweiler, so the agreement that the parties

16    have adopted, but I didn't see a copy of anywhere, it seemed to

17    be two pages between the law firm and Rambus.  That's something

18    both sides have.

19         And according to the plaintiff's letter, you have had

20    for a while?

21         MR. SCHLADWEILER:  We've had for a while, but I would

22    say that it's just been in production for a while.

23         If you look at all their --

24         THE COURT:  I'm sorry.  What does that mean?

25         MR. SCHLADWEILER:  In other words, they never

```
1    identified it as actually being an issue.

2            So, for instance, for your Honor's February 23rd

3    decision, if you look at all of their opposition papers, that --

4    it doesn't even mention this.

5            THE COURT:  No, I understand that, okay?

6            I understand that.

7            Mr. Bragalone, why am I hearing about this now?

8            MR. BRAGALONE:  That's absolutely a fair question, your

9    Honor.

10           And we tried to answer that in a response brief.  But

11   if I may?

12           First of all, may I hand you a copy of this, because I

13   don't think it was actually attached?

14           THE COURT:  I don't think it was attached either.

15           Sure.  Hand me a copy.

16           There doesn't seem to be any dispute that this happened

17   and stuff.

18           So, while I was curious about it, it also does not seem

19   to be -- in any event.

20           All right.

21           And so, back to my question.

22           MR. BRAGALONE:  Sure, your Honor.

23           We understood the Court in prior orders to say that

24   plaintiffs' Rule 11 investigation was not going to be compelled

25   and was not subject to discovery.
```

1          THE COURT:  Well, that was when the request was given

2     to the Rule 11 investigation, because they're obviously lying,

3     cheating, no good, and I said no.

4          MR. BRAGALONE:  And I'm not sure if they elaborated on

5     the reasons as your Honor suggested, but --

6          THE COURT:  It's pretty easy to figure them out.

7          MR. BRAGALONE:  -- but they were definitely after the

8     Rule 11 investigation.

9          And the Court repeatedly said --

10          THE COURT:  Right.

11          MR. BRAGALONE:  When the subpoena was directed to

12     Rambus and the Rambus teardowns, first of all, Rambus responded

13     to that.  When it was moved to this Court, we also joined in the

14     Rambus response with respect to that.

15          We did not understand that it was in any way seeking

16     the Rule 11 investigations that we had conducted beginning with

17     this June 14th Consulting Agreement.

18          THE COURT:  But I guess that's where I'm saying you did

19     not understand.

20          MR. BRAGALONE:  And that's because the defendants never

21     raised this, your Honor.  They understood that we were relying

22     on this.

23          THE COURT:  When you say "this," what are you talking

24     about?

25          MR. BRAGALONE:  I'm sorry.  The document that I've

1    handed you of June 14th, 2013, the Consulting Agreement, and

2    that we were claiming a Rule 11 --

3            THE COURT:  I guess I don't understand.  We had an oral

4    argument, you know, and then I got the status report saying, you

5    know, the plaintiff is not producing anything after June 14th of

6    2013.

7            And I forget exactly what it said, but my initial

8    reaction was, how can they just ignore my Court Order?

9            And I don't understand, because this is a much better

10   argument than the one that you were actually making.

11           MR. BRAGALONE:  And, your Honor, I have to tell you,

12   with the benefit of hindsight, always 20-20, but here there

13   would be no reason for us to intentionally withhold this.

14           And I cannot fully explain why we did not believe that

15   our Rule 11 investigation was being sought from Rambus.  We

16   didn't see them going through the back door that way.

17           Is that our fault?

18           Absolutely, your Honor.

19           Is that an intentional waiver of our Rule 11 work

20   product privilege?

21           We don't believe so.

22           And --

23           THE COURT:  Okay.  Hold on a second, Mr. Bragalone.

24           Mr. Schladweiler?

25           MR. SCHLADWEILER:  Yes, your Honor.

1          THE COURT:  Let's just say for the sake of argument

2     that I decide that there had been a waiver of privilege here,

3     and you could get all this stuff.  Given that the plaintiff is

4     not using it for anything, what is the relevance of it?

5          MR. SCHLADWEILER:  Sure, your Honor.  Whether or not

6     it's beneficial to them, it's obviously beneficial to us.

7          We think that it shows that we don't infringe.  And, in

8     fact, we've pointed that out in our Motion to Compel that the

9     teardown reports that were produced by Rambus pre-March 2013,

10    indicated that some of the products they're charting, and are

11    claiming infringe, don't actually infringe.  So, obviously, it's

12    of relevance to us, and we would use them.

13         Of course, they wouldn't use them in their Rule 11

14    investigation.

15         I would add that IDT wasn't even created at this time,

16    so I don't know how that would --

17         THE COURT:  But the -- in terms of, you know, among

18    other things, anticipation of litigation, clearly the law firm

19    here was doing this in anticipation of litigation, right?

20         MR. SCHLADWEILER:  What I can say, your Honor, is

21    that's their position now.

22         THE COURT:  Doesn't the record make it obvious?

23         MR. SCHLADWEILER:  I don't think the record makes it

24    obvious.

25         For instance, if you look at what they did in their

1    Motion to Compel.  We had two Motions to Compel, I'll remind
2    you.
3            We had one, which was a Motion to Compel plaintiffs,
4    which was a discovery dispute.
5            THE COURT:  Right.  I put that off for a month.
6            MR. SCHLADWEILER:  You put that off.  Yes, you
7    basically decided them at the same time.  And we sought all
8    teardown reports in that.
9            So, going to Mr. Bragalone's confusion about, you know,
10   whether or not we were actually addressing these specific
11   teardowns, I will note two things.
12           One, that our motion to them, you know, just said, all
13   teardowns.  They came up with -- they were the ones who pointed
14   out this March 2013 Agreement.  It wasn't us.
15           And, two, as your Honor pointed out, I mean, we
16   specifically identified exactly what we were seeking in our, you
17   know, our Declaration.  It was my Declaration that was submitted
18   with the motion, and we specifically pointed out what we were
19   seeking.
20           97 percent of those that you see on there were dated
21   after June of 2013.
22           So, what they did is, after the Court's decision, they
23   sent us a letter.  This was self-help.  They didn't --
24           THE COURT:  No, no, no, I got the self-help nature of
25   things.

1          MR. SCHLADWEILER:  Right.  And what they did is, they

2     changed the privilege log at the same time.

3          So, I think, there is no better evidence to show that

4     they're changing positions, and all you have to do is to look at

5     their privilege log.

6          THE COURT:  Okay.  So, tell me that, because --

7          MR. SCHLADWEILER:  Sure.

8          THE COURT:  Explain to me what you mean by they changed

9     their privilege log?

10         MR. SCHLADWEILER:  Sure.  And this is actually a couple

11    of exhibits to our motion.  It's Exhibits B and C.

12         Exhibit B is what the privilege log looks like before

13    the decision.

14         THE COURT:  Give me an example.  I don't want to spend

15    a lot of -- I don't want spend a lot of time comparing two

16    privilege logs to see what the differences are.

17         MR. SCHLADWEILER:  Sure.  I'll just give you an -- I'll

18    explain it in a nutshell.

19         Basically, prior to the Court's decision, both the

20    plaintiffs and Rambus log the same teardown reports, and they

21    logged the same -- in fact, it was verbatim.

22         They said, report prepared by Rambus at the request of

23    Eric Lucas.  Again, this was not at the request of Bragalone

24    Conroy.  It was at the request of Eric Lucas, pursuant to the

25    Consulting Agreement.

1    After the Court's decision, they changed it in two

2  ways.

3    One is, they say, well, no, this wasn't at the request

4  of Eric Lucas.  By the way, Eric Lucas provided two Declarations

5  saying it wasn't at his request prior to the Court's decision.

6    But they changed that to say, at the request of Eric

7  Lucas and plaintiffs' litigation counsel.

8    No. 2, they changed pursuant to a Consulting Agreement,

9  but pursuant to a Consulting Agreements, so they made multiple

10  agreements that they were now relying on.  Obviously, they're

11  trying to get the June 2013 Agreement in here.

12    There was never an issue.  They never raised that.

13  They had the burden -- that's also important.  They also had the

14  burden of proof on this issue.  They had the burden to describe

15  what their privilege was.

16    And they did, to their credit, plaintiffs and Rambus

17  both described it very well.  They said it was a March 2013

18  Agreement.

19    If you look at all the papers that were filed, you

20  know, prior to the Court's decision, it's very clear.

21    Plaintiffs, themselves, put in two Declarations of Eric

22  Lucas, and said, you know, I requested this information.

23    I mean, I don't -- if this is a disavowal of an argument, I

24  guess I really don't understand what it would be, because it's

25  pretty clear to me.

1                    THE COURT:  All right.

2                    Mr. Bragalone, do you have anything to say about Mr.

3      Lucas' Declaration saying he was the one that requested this?

4                    MR. BRAGALONE:  I do, your Honor, because he said that

5      he requested it on a behalf of IDT.

6                    And, your Honor --

7                    THE COURT:  I think he actually said on behalf Acacia.

8                    MR. BRAGALONE:  Well, he said on behalf of IDT, and

9      your Honor's Order called that into question.

10                   Your Honor's Order said, well, I think it hadn't been

11     created prior to March of 2013, therefore, I find that the

12     request must have been made on behalf of Acacia.  And that there

13     was no evidence that it was made by IDT.

14                   So, and I know Eric Lucas said that.

15                   Now, the distinction here is, your Honor, and, again, I

16     think what you have to do is, you have to remember that this was

17     initially directed only to Rambus.  And we came in after the

18     motion was filed against Rambus.

19                   They knew of the Consulting Agreement.  They never

20     attacked anything under the Consulting Agreement.

21                   Did we actually walk through the rationale of the

22     Court's Order as we did?

23                   We understood that the Court said that, look, for a

24     party that didn't exist, we have to say that it was requested by

25     Acacia.

1          And that much was clear, that Acacia was requesting

2     this pursuant to the Consulting Agreement between Acacia and

3     Rambus.

4          But once my law firm got involved, and we started a

5     Rule 11 investigation, they were under that Consulting

6     Agreement, which also what my law firm did.  We got involved

7     here directly, and actually had a meeting on June 18th, where we

8     discussed -- and I don't want to waive any privilege --

9          THE COURT:  No, no, I read what you wrote.  I read the

10    Declaration of Mr. Kennedy, and I believe Mr. Lucas, that you

11    filed in connection with this one.  I -- I got kind of a flurry

12    of activity after the June 14th.

13         MR. BRAGALONE:  So, we get involved at this point.  And

14    I also want to go back, and something that was said that is just

15    flat incorrect.

16         The alleged relevance here, the vast majority of these

17    don't relate to LG products or the products of any defendant

18    here.

19         This was our Rule 11 investigation for the initial

20    litigation that we filed.  It related to, you know, Apple

21    products.

22         THE COURT:  Right.  I know you sued like 12 different

23    people, so I understand what you're saying.

24         MR. BRAGALONE:  They're saying that all of that Rule 11

25    investigation, none of which, none of which is going to be

1 relied on as evidence in this case, is somehow relevant to any

2 claim or defense.

3    Your Honor, if we're not making an infringement claim

4 on a product, then there is no way that that can be relevant to

5 a defense.  And the fact is, we are not, in any way, shape, or

6 form relying on that.  That was our effort at our Rule 11

7 investigation.  And I must say, it was a substantial Rule 11

8 investigation.

9    THE COURT:  Certainly generating 40,000 pages worth of

10 stuff.

11    MR. BRAGALONE:  It really was.  I mean, to say that we

12 filed this lawsuit without adequate investigation --

13    THE COURT:  So, Mr. Bragalone, this is not a Rule 11

14 Hearing.  You don't need to defend your investigation.

15    MR. BRAGALONE:  Fair enough.  In hindsight should we

16 have raised this earlier and would this have been a better

17 argument?

18    Yes.

19    There is nothing I can say in candor to the Court that

20 would change that fact, but it was not an effort to lay behind

21 the law, it was not an effort to have a second bite of the

22 apple.  We did not understand at any point that they were

23 challenging Rule 11.

24    THE COURT:  I got what you have to say.

25    Is there anything that you want to say in addition, Mr.

1    Schladweiler?

2            MR. SCHLADWEILER:  Yes, I would.  I would add, your

3    Honor, that obviously, if they're saying they're irrelevant, why

4    they did they log them if they were relevant?

5            They were useful to us.  We've already argued the

6    relevance of these in the Motion to Compel.

7            And to his point about how he didn't have notice, I

8    think that we -- we moved to compel plaintiffs.  We moved to

9    compel plaintiffs' for all the teardown reports.

10           And your Honor said you would take it up as part of the

11   February 23rd Order, so think that that's -- it's pretty clear

12   that they were on notice that we were -- with exactly what we

13   were doing.

14           THE COURT:  All right.

15           Let's do this.  Let's take a real short recess.  I'll

16   be right back.

17           (A recess was taken at 11:37 o'clock a.m.)

18           (The proceedings resumed at 11:39 o'clock a.m.)

19           THE COURT:  All right.  Please be seated.

20           Not that it's important to what I'm about to say, but I

21   think that Mr. Lucas's earlier Declaration actually said he had

22   ordered these things pursuant to the Consulting Agreement, and

23   the Consulting agreement was between Acacia and Rambus.

24           So, I'm perplexed by this particular issue, because I

25   think plaintiffs' argument for not producing these teardown

1    reports that are specifically called out in Mr. Schladweiler's

2    Declaration and which now the defendants understandably were

3    seeking, it makes no sense to me.

4         You know, there is an agreement that had I had it a few

5    months ago, plaintiff would have won from June 14th going

6    forward without much time being spent by me.

7         And I wouldn't have had to spend the time on the three

8    months that were actually in dispute that over that, preceded

9    it.

10        I think, clearly what, to me at least, what Rambus did

11   after June 14th seems to me to be covered by both the

12   attorney-work product and attorney-client privilege, so I would

13   have ruled in plaintiffs favor on that.

14        And so, why they didn't make this argument, which seems

15   is a whole lot better argument to me, and why didn't they make

16   it before, I can only attribute to an oversight, because it

17   makes no sense to me from any other point of view.

18        And it is also my belief that defendants' need for

19   these teardowns is essentially zero, because plaintiffs aren't

20   using them for anything.  And I will credit that probably three-

21   quarters of them probably don't involve LG's LCMs -- well, some

22   substantial portion doesn't actually involve this case, but

23   that's not the basis for the decision here.

24        And I think there is little or no relevance given what

25   plaintiffs have represented, and I don't think the possibility

1    that there is somewhere buried in here a teardown that supports

2    defendant's position.  Their own ability that they've been doing

3    their own teardowns.

4          And so, I'm mindful that to me waiver is a high

5    standard, and I'm going to give the benefit of the doubt to the

6    plaintiffs that they haven't waived any privileges here.

7          So, I'm going to deny the production of these 35 or

8    40,000 pages that are on the Rambus privilege log.

9          All right.

10         So, then, we also have the teardowns involving

11   ███████████████████   ████████  ██████████████████.  And it seems to

12   me that this is a stronger case for not ordering the production

13   than the stuff Rambus did.

14         So, unless Mr. Schladweiler, or somebody who wants to

15   be on heard on this at some point, I'm going to deny this, too.

16         MR. SCHLADWEILER:  Sure, your Honor.

17         Just a couple of things on that.

18         I would like to note that up until this point, we

19   really don't understand, I guess, what the basis for their

20   privilege is.

21         If you look at ██████████████████ -- I'm just going

22   to call it ██, your Honor, just to make it easy -- if you look

23   at ██, ████████████████████████████████████████████████

24   ██████████████████████ ██ ██████████████████████ or any

25   indication they had an agreement with Rambus.  We don't see an

1   agreement on there at all, so we don't know what the basis of

2   their privilege is.

3         We had a meet-and-confer with them after they, you

4   know, they changed their privilege log on March 1st to say that

5   some of these Rambus teardown reports were actually done by TI.

6         And so, we had a meet-and-confer with them and they

7   couldn't explain the basis at that time.

8         We basically asked about whether or not there were any

9   agreements for both ██  ██  ████████████ .

10        And they said, they don't know, they're going to look

11  into it.

12        But yet at the same time, they already had this log.

13  And so, they were also already trying to hide behind the

14  privilege in producing this information.

15        I think with respect to ██████████ , it's even

16  clearer.  This is their log entry.

17        It says, plaintiffs claim their technical analysis in

18  claim charts prepared at the request of Eric Lucas pursuant to

19  Consulting Agreements.

20        We asked them what Consulting Agreement you're even

21  talking about, and they've never provided this to us.

22        So, we have -- so, we're really operating in the dark

23  on all of this.  All we know is that -- we do know that

24  ████████████    ██████████████████████ Rambus

25  was performing.  They were doing the overflow work for Rambus.

1   We don't know even if there is an agreement with them.

2          THE COURT:  So, didn't Mr. Kennedy submit a Declaration

3   -- and I'm summarizing here obviously -- saying that ███████

4   █████ did this in anticipation of litigation?

5          MR. SCHLADWEILER:  But he also -- they also say on

6   there, yes, but he also says on their privilege log it is

7   pursuant to a Consulting Agreement we don't have that.

8          I would also add that's what they said on their log

9   was, even if the ███████████ did this, you know, in

10  anticipation of litigation, the question, again, pursuant to the

11  Court's Order is, who was anticipating and in what litigation?

12         I mean, this isn't a third party.  If ████████

13  █████ had an agreement, for instance, with Acacia, or an

14  agreement with somebody else that's not a party to this case,

15  then we would have the same work product concerns that we had

16  with Rambus.

17         THE COURT:  All right.

18         Anything else?

19         MR. SCHLADWEILER:  I think that's generally it, your

20  Honor.

21         THE COURT:  All right.

22         Mr. Kennedy, in terms of ████████████, maybe this

23  was in your Declaration, or maybe it was somewhere else, or

24  maybe it wasn't, did they do all of their -- when did they start

25  their work?

1           MR. KENNEDY:  I'm not certain of the exact date.

2           THE COURT:  Was it before or after June 14th of 2013,

3    do you know?

4           MR. KENNEDY:  I don't know.  I would have to look at

5    the privilege log to figure that out.

6           MR. BRAGALONE:  That's actually a different agreement.

7           THE COURT:  No, no, I understand it's a different

8    agreement.  I thought they were probably contemporaneous.  I was

9    making an assumption there.  I don't know.

10          Is there actually a written agreement with █████████

11    ██████?

12          MR. BRAGALONE:  No, your Honor.

13          THE COURT:  Okay.  I thought that might be the case.

14          MR. BRAGALONE:  And with respect to ████████████

15    ██████, I just wanted to correct the record.

16          We don't refer to a Consulting Agreement on our

17    privilege log.  Mr. Schladweiler stated that.  That's not

18    actually the case.

19          MR. SCHLADWEILER:  I think what I said was, they don't

20    identify an agreement for Transcendent Imaging.

21          THE COURT:  So, you're on the same page there?

22          MR. SCHLADWEILER:  Yes, as far as that goes.

23          MR. BRAGALONE:  I think he just misspoke.

24          Basically, ████████████████████ was doing reverse

25    engineering at our request.  We had already been brought on.

 1          THE COURT:  Well, that's the reason why I'm asking Mr.

 2   Kennedy.  I'm trying to figure out whether it was actually at

 3   your request, because -- and I guess -- and I'm sorry -- I'm

 4   kind of asking Mr. Kennedy.  I think he has more personal

 5   knowledge of this.

 6          Did Effectual Services sign on before you signed on?

 7          MR. KENNEDY:  I don't know the answer to that.  I know

 8   that █████████████████ was working at the direction of counsel

 9   to prepare drafts.

10          THE COURT:  And when you say "at the direction of

11   counsel," do you mean counsel that are sitting in front of me,

12   right?

13          MR. KENNEDY:  Counsel in front of you through Acacia's

14   in-house counsel -- through IDT's in-house counsel, Eric Lucas.

15          So, we conveyed our request about claim charts to IDT,

16   but not counsel who would relay it to ████████████.

17          THE COURT:  All right.

18          MR. BRAGALONE:  Yes, I can tell your Honor that we were

19   on board before ██████████████, because they were actually

20   retained at our request and suggestion.

21          We had specific requests that were different in

22   addition to what Rambus was doing.  We also, it was mentioned,

23   had an issue where we need additional work done that Rambus

24   wasn't account do.

25          At our request, ██████████████████ was retained to do

1    additional work, so I do know that they post-dated our

2    involvement.

3              THE COURT:  All right.

4              And do you know that in terms of ████████████

5              MR. BRAGALONE:  I believe that's also the case with

6    ████████████████, your Honor, because of when we interacted

7    with them in terms of what we needed to see on the draft claim

8    charts that were done.

9              So, there are some claim charts that Acacia prepared --

10             THE COURT:  Mr. Bragalone, I'm sorry to interrupt.  But

11   ████████████████, essentially they're doing the exact same

12   kind of work that Rambus was doing, right?

13             MR. BRAGALONE:  That's right.

14             THE COURT:  But ████████████████ is more like not

15   lawyers, but they're some kind of people who you subcontract out

16   claim charting to?

17             MR. BRAGALONE:  That is correct, your Honor.

18             We're much more involved in terms of what the claim

19   charts are going to show, and what we were trying to chart.

20             So, that's why the attorney-client privilege applies

21   there, because they are actually consultants who were working

22   with us to provide advice to the client vis-à-vis these claim

23   charts.

24             Again, none of this is used in any manner or will be

25   used in the litigation.  The majority of all of these do not

1    relate in way to any LG products or LG LCMs.  It was our Rule 11

2    claim chart.

3             THE COURT:  All right.

4             MR. BRAGALONE:  And also, these were part of the Rambus

5    motion, obviously.

6             THE COURT:  Right.  I got that.

7             Yes, Mr. Schladweiler?

8             MR. SCHLADWEILER:  Just to add, your Honor, whether or

9    not they post-dated their involvement, they did predate the --

10   basically, the plaintiffs' existence, at least some of this

11   stuff, both for ███████████   ████████ █, they post-dated

12   plaintiff's existence -- predated plaintiffs' existence, and

13   also predated the assignments of the patents over to plaintiffs.

14   A good chunk, for instance, is the ██ ██████ seven out of 22.

15            THE COURT:  I'm sorry.  Seven out of 22 is what?

16            MR. SCHLADWEILER:  Seven out of the 22 reports that

17   they logged predated the existence of the plaintiffs.

18            THE COURT:  So, you're saying -- and I forget -- IDT

19   came into existence when?

20            MR. SCHLADWEILER:  Somewhere in 2013.  I don't know the

21   exact date.

22            MR. BRAGALONE:  I want to clear something up.

23            There are two different dates here.

24            The creation of IDT had already happened, your Honor.

25   So that's not accurate.

1          The transfer of the patents did happen later.

2          THE COURT:  Right.  That's what I thought.

3          I thought IDT was created in March?

4          MR. BRAGALONE:  Yes, back in March, your Honor.

5          THE COURT:  And the other one wasn't created until

6     December.

7          MR. BRAGALONE:  LGD was in December, that's correct.

8          THE COURT:  You know, it doesn't really matter.

9          MR. BRAGALONE:  But in terms of the actual assignment

10    of the patents that did occur later.  And I want to point out

11    the assignment of patents, that's relevant to the common

12    interest privilege, but we're not claiming common interest

13    privilege with respect to these.

14          It's really a different issue.

15          MR. SCHLADWEILER:  I guess I just spoke as to the

16    creation of IDT.  But we were talking about when the patents

17    were transferred and assigned over, your Honor.

18          THE COURT:  All right.

19          Well, I'm satisfied based on the Declarations and the

20    representations that ███████████████    ████    ██████████████

21    were both involved, at least in part, at the direction of

22    plaintiffs' law firm, so, I believe that's what they did is,

23    indeed, privileged.

24          And, in any event, in light of the representations that

25    we're never going to hear about what they did again, I also

1    think that getting what they did is essentially irrelevant, so

2    I'm going to deny that request.

3            All right.

4            So that leaves a third thing, which has to do with --

5    this is the -- oh, this is about tracking down, I guess sort of

6    chain of custody on the products you've been purchasing for --

7    so you can do your teardowns on.

8            And the plaintiffs' response is, it's too burdensome

9    and there's too much confidential information like credit card

10   numbers, because we're buying these things over the internet

11   using e-mails, is that right?

12           MR. KENNEDY:  That's correct.

13           THE COURT:  So, is there a lot of trafficking in

14   counterfeit LCMs?

15           MR. KENNEDY:  Right.

16           THE COURT:  That was kind of what you were saying,

17   right?

18           MR. BEABER:  Well, I did.  It's twofold.

19           One, we understand that plaintiffs have purchased some

20   repaired or refurbished products.

21           THE COURT:  Hold on.

22           Is that right?

23           MR. KENNEDY:  I believe we have purchased some

24   refurbished products, but I don't think it's a large percentage.

25           THE COURT:  Well, are you trying to use the refurbished

1    products for some point?

2           MR. KENNEDY:  Yes, for infringement purposes.  I don't

3    think -- just because it says, refurbished, does not mean that

4    it doesn't have the components in it that are infringing.

5           THE COURT:  So, let's me ask this, because this is what

6    I think, or this would be a reasonable thing for the defendants

7    to be asking for, I think is, show us that what you got is

8    something that actually represents something that is sold in the

9    United States as our -- by us?

10          MR. KENNEDY:  And I believe all the LG LCMs have

11   stickers on them that say LG Display and the model number, and

12   then have designations or used in the United States, compliance

13   for sale in the United States.

14          THE COURT:  And these are the things, because I think I

15   signed some Order or I -- maybe I wrote in an Order before I

16   gave up -- these are the things that are in either Arizona or

17   Austin?

18          MR. KENNEDY:  That's correct.

19          THE COURT:  And at least when I wrote the last Order,

20   or the Order that I'm thinking about, the defendants had been to

21   see what you had in Austin, but not what you had in Arizona,

22   right?

23          MR. KENNEDY:  That's correct.

24          THE COURT:  And have they now been to Arizona?

25          MR. KENNEDY:  My understanding is that they are in

1    Arizona right now.

2           MR. BEABER:  Your Honor, that was not LG.  We were just

3    given information.  We were not permitted inspection.  I think

4    our first inspection started yesterday, if I'm not mistaken.

5           THE COURT:  Okay.  Well, here's the thing.

6           And so, let me just deal with the -- you know, there's

7    a request for purchase orders.

8           Isn't it the case that when you buy one of these

9    things, you're going to get some document from whoever you

10   bought it from, saying, you know, you have now bought -- I mean,

11   you're going to get a sales invoice or something like that?

12          MR. KENNEDY:  That's correct.  They're varying in

13   degrees of detail.  And depending on what -- what -- who you buy

14   them from.  We bought some from Amazon.  We bought some from

15   eBay.

16          So even amongst the eBay purchases, it depends on what

17   particular eBay seller is selling them as to what details you

18   get.  I'm not sure even that there are representations -- well

19   --

20          THE COURT:  So, is it something that you have a list of

21   which ones you bought from Amazon, and which ones you bought

22   over eBay?

23          MR. KENNEDY:  We have a list of the ones that we

24   purchased, that's correct, but in some instances the seller who

25   sold them from eBay would not give us the actual LCM that they

1  said they were going to, but they gave us a different LG LCM

2  that we could use anyway.

3          So, it's not exactly clear how to line up the invoice

4  with the ones that we actually got.

5          THE COURT:  How many, approximately, products did you

6  purchase?

7          MR. KENNEDY:  Oh, I would imagine we purchased around

8  the order of four to 500.  It was a very substantial

9  undertaking.

10          THE COURT:  And, so far right now what you have -- what

11  you're willing to give the defendants is, you can come and

12  inspect the things, and they have -- I don't know -- the bar

13  codes or some other kind of identifying information?

14          MR. KENNEDY:  Right.  They have an LG sticker on them

15  that says -- and it's a standard sticker that they put in their

16  specifications for approval.  They should be able to identify

17  the product date from that.  It's their own product.  But they

18  should be able to see if it's counterfeit.

19          THE COURT:  All right, Mr. Kennedy.

20          So, since your people are going out to inspect all

21  these things, don't you think your people will know whether --

22  why is what Mr. Kennedy says they can see when they get out

23  there, and take a photograph of it, and keep it for their files,

24  why isn't that good enough to establish what it is that I think

25  you're trying to establish?

1           MR. BEABER:  We will not be able to tell if that's

2     authenticate or not.

3           THE COURT:  Well, if they had something saying they

4     bought it from Joe Shmoe over at eBay, how is that going to help

5     you prove if it's authenticate?

6           MR. BEABER:  I know if you go on Amazon, it tells you

7     if it's refurbished, new, or what.

8           So, there is a category that they purchased it in.  The

9     voice should say it's a refurbished product, if it's a new

10    product.

11          My problem is, there's not a market in LCMs.  There's a

12    market for televisions.  So they are purchasing these LCMs

13    through channels that aren't a distribution channel for LG.

14          So, I think what's happen is, they are purchasing these

15    from individuals who have taken these out of displays,

16    televisions, monitors, et cetera, for some purpose, which in

17    many instances that purpose may be the product was damaged.

18          I don't know what they're doing to the LCMs.  And I

19    would add, we produced all of our invoices and everything for

20    the prior art products.

21          I understand their issue with credit card information.

22    There's just four digits.  We produced our stuff unredacted.

23    There's not a lot of confidential information --

24          THE COURT:  So, here's what I'd like you to do, Mr.

25    Kennedy.

1          Did you think you can produce one piece of paper for

2    each of your 500 products?

3          You can redact out, if there is some place where there

4    is a credit card number, or even the name of a purchaser, and

5    it's, you know, you're using your own individual credit cards to

6    do that, you can redact that in?

7          MR. KENNEDY:  I --

8          THE COURT:  In other words, I don't think it's totally

9    frivolous for the defendants to say, we'd like to know where you

10   got these things from.

11         MR. KENNEDY:  So, let me explain it in a little more

12   detail.

13         I'm not -- the redaction is not as big of an issue as

14   the issue that we had to purchase 508 to get down to around the

15   200 that we could actually chart, because the ones that --

16         THE COURT:  Well, then, you have to only chart 200 that

17   you're actually using.

18         MR. KENNEDY:  Understood.

19         But sometimes a receipt will come in for an LCM that

20   will say you're getting LG LCM A, but we actually got LG LCM B,

21   so we might not have a receipt that matches up to that.

22         THE COURT:  No.

23         MR. KENNEDY:  I don't think we'll be able to match them

24   up one-to-one.

25         THE COURT:  I would think it's the case, but I could be

1     wrong, they're not asking you to give them the paper that you

2     actually got that goes along with your products.

3            I would imagine it's the case, but, again, I could be

4     wrong, that you can actually say, okay, so they said they would

5     produce the LCM A and we actually got the LCM B, but this is the

6     piece of paper that goes with this product, right?  You can do

7     that?

8            MR. KENNEDY:  If the people have the receipt they got

9     -- kept the packing slip with the actual product.

10           THE COURT:  But you, presumably, had to pay for all

11    these things, don't you for -- I don't know -- for some tax

12    reasons or some other reasons, don't you keep pieces of paper

13    like that?

14           MR. KENNEDY:  Right.  We have all the receipts for what

15    we purchased, but it's hard to go through and line up the

16    receipt with the actual product.  We bought so many of them.  We

17    were trying to chart them at some point in time.  I'm not sure

18    the receipts line up exactly.

19           THE COURT:  All right.

20           Well, for the 200 you charted, do the best you can to

21    produce the receipts that go along with them.

22           Right, that's what you want?

23           MR. BEABER:  That's correct, your Honor.

24           THE COURT:  You know, I don't think that's terribly

25    burdensome, and I think it actually has some -- it could be

1     germane to whether or not these things are actually reliable

2     indications of, you know, whether the refurbishing might have

3     done something or other.

4            So, I'm going to order that you -- and so, what you've

5     asked here is, to supplement their response to LGD RFP Nos. 24

6     to 38, and produce -- I'm just going to say at least one

7     document for each of the 200 or so charted teardowns?

8            MR. BEABER:  That's fine.  I mean, we'd like to know

9     where they got it from or how they purchased it, so that piece

10    of paper indicates that.

11           I guess my problem is more broadly with Mr. Kennedy's

12    statement.

13           I mean, if we get to trial and there is nothing that

14    authenticates the purchase of these documents, which I think

15    chain of custody and authentication, how are we going to know

16    what was done with these products, et cetera?

17           So, I guess I've got additional concerns, given his

18    response.  But at a minimum, for purposes of completing fact

19    discovery and expert discovery and doing our own investigation,

20    we need know where they came from, how they got them, and

21    whether they're authentic products.

22           THE COURT:  The papers aren't necessarily going to say,

23    we're sending you an authentic LCM versus we're sending you an

24    inauthentic LCM.

25           They're just going to describe whatever it is that they

1    are purportedly selling.  And if plaintiff is out there being

2    fleeced by people selling counterfeit LCMs, you know, you're

3    going to have figure that out, because I don't think any of

4    these pieces of paper are going to say that.  But maybe they'll

5    cause you to look at some more suspiciously than others.

6           So, I'm going to say, produce at least one piece of

7    paper documenting the purchase of each of the 200 or so charted

8    LCMs.

9           And by one piece of paper, you know, I'm not limiting

10   you to one kind of piece of paper, but try to produce a piece of

11   paper that actually does show the source and the price of the

12   thing that you purchased.

13          And I think if you have that, that will at least give

14   the defendant a head start on what they're trying to do, all

15   right?

16          MR. BEABER:  Thank you.

17          MR. KENNEDY:  Thank you, your Honor.

18          THE COURT:  That resolves this one.  And I will sign

19   it.  All right.

20          On to VIZIO.

21          So, the next thing on my pile here is in Case 13-2112,

22   which is against VIZIO.  Docket Items 197 and 202.  This is

23   VIZIO's request.

24          And so, we've got the four agreements that were

25   identified in a different agreement, and these are four

1    agreements that were entered into before plaintiffs or Acacia

2    owned the Rambus patents.

3            There is something that a judge in California has

4    already denied.

5            Ms. Kraman?

6            MS. KRAMAN:  Yes.

7            Your Honor, VIZIO wasn't a party to that, so I don't

8    know exactly what happened in California.

9            I'm basing my knowledge of that on the decision that --

10           THE COURT:  That's the way judges do things, yes.

11           MS. KRAMAN:  I have as much information as you do.

12           You know, initially, one of the things I understand in

13   the Court's decision was that the Court noted that Acacia told

14   the California Court that plaintiffs were in possession,

15   custody, and control of the documents that we're seeking.

16           And that was the same testimony that Mr. Vella

17   testified was -- and he was IDT's president at the time.

18           He also said that some of plaintiffs would have used

19   the agreements in order to prepare Exhibit F to the RPX

20   Agreement, which were being encumbered to the patents-in-suit.

21           And now plaintiff submits in their letter to your Honor

22   the Treska Declarations, which is an Acacia Declaration, saying

23   the opposite.

24           We don't know which is right and which is wrong.  I

25   think that regardless of whether or not -- we think your Honor

1    is in a better position to, one, determine the relevance of

2    these issues in this case, but even if you assume what they say

3    is correct, or what Mr. Treska says is correct, that these

4    agreements are not licenses under the patents-in-suit.  They're

5    still relevant to issues in this case.  They're still relevant

6    to damages.

7           THE COURT:  Why?

8           MS. KRAMAN:  Plaintiffs' licensing policies, which is

9    one of the factors, the GP Factors, the Georgia Pacific factors,

10   so --

11          THE COURT:  So, under that theory any license that

12   plaintiff -- and the plaintiff being Acacia -- any license that

13   they've every done is a relevant license?

14          MS. KRAMAN:  Well, these are licenses with respect to

15   the relevant subject matter.  I think we have the right to

16   accept the comparability.

17          THE COURT:  Well, these are licenses, I presume, to

18   everything in -- or I wrote about that -- these were licenses to

19   everything that was in Acacia's portfolio at the time, right?

20          MS. KRAMAN:  That is my understanding.  They're

21   portfolio licenses.

22          But I think we should -- we should be able to assess

23   their comparability to the technology here, and we can't do that

24   with their proposed -- and I don't even know if that -- we were

25   not aware of their redacted -- they claim that Acacia offered to

1    produce redacted versions.  That was news to the defendants,

2    that specific proposal.

3           But we're not sure even the redactions they're

4    proposing would allow us to assess the comparabilities of the

5    licenses.

6           THE COURT:  All right.

7           So, first, let's just deal with that little side point.

8           How did plaintiffs propose this redacted version or was

9    this something that Acacia proposed?

10          You don't need to come forward.

11          MR. BRAGALONE:  That's correct, your Honor.

12          It's something that Acacia proposed in the negotiations

13   in the prior meet-and-confer.

14          THE COURT:  So, that's the reason why, at least VIZIO

15   in particular, would know nothing about this, and you wouldn't

16   know too much about this either, because it was between Acacia

17   and somebody else?

18          MR. BRAGALONE:  Well, that's correct.  Although, it's

19   also in the Order itself.  The Order itself notes that --

20          THE COURT:  Well, that's true.

21          MR. BRAGALONE:  -- that there were -- there was an

22   offer to produce redacted agreements, but that's not sufficient.

23          THE COURT:  All right.

24          Well, it seems to me that these four portfolio licenses

25   entered into before Acacia even had the Rambus patent, it's just

1    irrelevant, and I don't think it's actually relevant to any of

2    the Georgia Pacific Factors, other than in the most attenuated

3    possible way, so I'm going to deny that.

4         Let's go on to the next one.

5         MS. KRAMAN:  Before we move on, your Honor, I just

6    wanted to make sure that you received copies of the corrected

7    proposed order that we filed, if not, I have copies?

8         THE COURT:  You know, I did see that you had filed such

9    a thing, but I didn't print it out, so I appreciate a copy.

10        I couldn't tell what it was that you were correcting.

11        MS. KRAMAN:  It was a minor change, but an important

12   one.  I just wanted to make sure.

13        THE COURT:  All right.

14        Wait.  I'm sorry.

15        All right.

16        Let's go on to the second one.

17        The second point was VIZIO's request for the model and

18   date received of all VIZIO products that plaintiffs obtained, as

19   well as an inspection of them.

20        They have provided us an inspection of products that

21   they obtained after your Honor's Order in November of 2015.

22        Basically, what we're looking for is reciprocity here.

23   They have asked us, VIZIO, to produce for their inspection every

24   product sample that we've obtained for this litigation.

25        THE COURT:  So, leave aside reciprocity for a minute,

1    because my -- looking at the Order --

2          MS. KRAMAN:  Mm-hmm.

3          THE COURT:  -- and I'm looking at my notes, and they're

4    not necessarily aligned.

5          Is this something where you believe -- does it relate

6    to accused products, or unaccused products, or both?

7          MS. KRAMAN:  So, this relates to both, essentially.

8          So, what we're asking for is, they have refused to --

9    to give us the same products that they've asked us to provide,

10   and that we've given them.

11         Any products that VIZIO has procured and -- and

12   reviewed for purposes of this litigation, whether counsel has

13   procured them, or what.  They just wanted everything, so --

14         THE COURT:  All right.

15         So, basically, you're saying every VIZIO product that

16   your team has reviewed, has been made available to them?

17         MS. KRAMAN:  They asked us for them and we've agreed.

18         THE COURT:  Okay.

19         MS. KRAMAN:  And we're asking for reciprocity.

20         So, they've agreed to give us the product.  An Mr. Lo

21   will correct me if I'm wrong, but they've agreed to let us

22   inspect the product that they specifically charted, presuming

23   that that is what they meant.

24         THE COURT:  Why do you want to inspect the uncharted

25   non-accused products?

1          MS. KRAMAN:  We want to see what else that they've

2     looked at for purposes of our defenses for non-infringing

3     alternatives.  We want to see what else they've looked at.

4          And, again, they've asked us for the same and we've

5     agreed.

6          THE COURT:  All right.

7          Hold on a second there.

8          So, who's speaking on behalf of -- Mr. Kennedy?

9          MR. KENNEDY:  I am, your Honor.

10         So, we offered for them to inspect -- for VIZIO to

11    inspect all of these products that we charted.  That's not in

12    dispute.  I don't think the products that are uncharted are

13    relevant to the case.

14         THE COURT:  Well, what about the reciprocity points?

15         MR. KENNEDY:  They recently agreed to let us see their

16    products.  I think their products, all the ones that they have

17    are relevant.  Because of the effort we spent to try to obtain

18    as many of VIZIO products as we could, we got as many as we

19    could.  They might have some that we were unable to get.

20         THE COURT:  Bu what you're saying is, the only thing

21    they have is accused products?

22         MR. BRAGALONE:  They never told us.

23         MR. KENNEDY:  If they only have accused products, I

24    don't that think we need to see them.

25         Sorry.  If they only have unaccused products, I don't

1   think --

2          THE COURT:  Well, wait a second.

3          So, too many people standing up here.

4          Ms. Kraman, the products that VIZIO has that plaintiff

5   asked to see, are they all accused products, or do you have

6   unaccused products, too?

7          MS. KRAMAN:  That, I don't know.  I mean, as you know,

8   it's been kind of unclear what has been accused and not accused

9   in this case.

10         I don't know.  They didn't make that distinction.

11         THE COURT:  And so, just walk through me with this.

12     So, let's assume they got -- I take it there are some LCMs

13  that are not accused?

14         MS. KRAMAN:  You're asking that of plaintiffs?

15         THE COURT:  Anybody.

16         MR. BRAGALONE:  Presumably, your Honor, there would be

17  some VIZIO products that --

18         THE COURT:  I'm not talking about products.

19         What I'm asking is, are there any -- okay.  This is a

20  stupid question, because VIZIO doesn't make LCMs.

21         So, right, there are a lot of products that VIZIO does,

22  they have LCMs that come from people who have licenses and other

23  things.

24         MR. BRAGALONE:  Your Honor, we have no reason to

25  believe that they are producing to us any unaccused products at

1    all.

2           So, this whole argument about reciprocity, I think is

3    based on an assumption that they've said, come and look at our

4    products.  There was never any discussion about whether they had

5    unaccused products.

6           Ms. Kraman is not able to tell you whether they have

7    any unaccused products for us to look at, so I think the

8    reciprocity argument really falls.

9           THE COURT:  Ms. Kraman?

10          MS. KRAMAN:  They asked us.  I'm basing my statements

11   here on what they asked.

12          They didn't ask us to see all the accused products that

13   you've looked at.  They asked to see any products that VIZIO has

14   inspected, period.  Whether -- regardless of the source, and who

15   looked at it, or who requested it, and looked at it.

16          And we acquiesced.  We told them that they could.

17          If we just gave them the permission to do that, it's

18   because they asked us, and we gave them the permission.

19          I don't know the answer to that question, because I

20   don't know every product that we've looked at, but they didn't

21   make that distinction in their request.

22          THE COURT:  Do you have a ballpark figure of how many

23   VIZIO products you have that are subject to their request?

24          MS. KRAMAN:  I'm not sure.  It's a small number, but

25   I'm not sure.

1              THE COURT:  A small number is 25?

2              MS. KRAMAN:  Oh, I think less than that.  VIZIO doesn't

3      maintain -- they don't maintain inventory, so --

4              THE COURT:  Right, right.

5              MR. BRAGALONE:  We understood it's less than five.

6              THE COURT:  Less than five, okay.

7              How many VIZIO products do you have, Mr. Kennedy,

8      ballpark?

9              MR. KENNEDY:  I know we have around 30 charted VIZIO

10     products.  As far as uncharted VIZIO products, I'm not certain,

11     but I would estimate around ten.

12             THE COURT:  And the reason why they're not charted is

13     because they have an LCM that's licensed to somebody else?

14             MR. KENNEDY:  Our expert, we got the wrong one, our

15     expert decided not to, for reasons we internally discussed,

16     decided that we weren't going to chart that product.

17             THE COURT:  All right.

18             I'm going to deny the defendant's request.  It seems to

19     me that the relevant things here are the products that they've

20     charted.

21             I don't think, in view of the ambiguity about what

22     exactly reciprocity here means, in other words, it's all VIZIO.

23     If the five products that VIZIO has are accused products, then

24     it's kind of superfluous whether -- how exactly plaintiff

25     phrased their request.

1          So, I'm not going to rule in favor of VIZIO on the

2    reciprocity theory.

3          And, in terms of relevance, I really don't think that

4    inspecting other products that have not been charted for one

5    reason or another is going to lead to any relevant evidence, so

6    I'm going to deny that.

7          Let's go on the next one.

8          MR. KRAMAN:  Just one clarification, your Honor.

9          So, in light of your Order, if the half a dozen or so

10   products that VIZIO has, if they relate to uncharted products

11   and likewise, plaintiff should have no need to inspect those

12   either?

13         MR. KENNEDY:  That's fine, your Honor.

14         THE COURT:  Okay.  That's fine.

15         MR. BEABER:  Your Honor, that would apply to the LG

16   defendants as well.  I know we agreed to teardowns, but if the

17   scope of the teardowns that we need to provide are just accused

18   products --

19         THE COURT:  Well, Mr. Beaber, you're throwing too much

20   to -- why don't you talk the defendants or plaintiffs.  You are

21   the defendant.  Talk to them at some other time other than right

22   now, okay?

23         MR. BEABER:  Of course, your Honor.

24         THE COURT:  All right.

25         So the next one was -- hold on a second.

1          Oh, so the next thing in the Order was No. 3, which I

2    believe was on the basis of a footnote in your letter?

3          MS. KRAMAN:   Number 2 and 3 are both related to the

4    same request.

5          So, those are the interrogatories that associate with

6    the overall request.  What we're asking for is the narrative

7    response.  We're asking for the accused products.

8          They provided -- and this is -- the interrogatory is

9    limited just to the accused products, and specifically Rog 5,

10   which is .3 -- I'm sorry -- what I have is Rog 2.

11         Rog 1 and 5 are the issues there.

12         Rog 1 asks when did the -- when plaintiffs first became

13   aware of VIZIO's infringement.

14         And then Rog 5 asks for the -- for each accused

15   product, the model number and date obtained by plaintiffs, and

16   they provided no response.  No substantive response to either of

17   those interrogatories.

18         THE COURT:   Well, so, the model numbers and the dates

19   for VIZIO products torn down and being charted, that's the 30 or

20   so that Mr. Kennedy -- that you are going to be, I believe,

21   inspecting, right?

22         MS. KRAMAN:   Correct.  And we were just requesting that

23   they provide us with the model number and date obtained relevant

24   to the request.

25         THE COURT:   Mr. Kennedy?

1          MR. KENNEDY:  I don't see how the date obtained for

2     these is relevant.

3          THE COURT:  But, presumably, this is -- well, Ms.

4     Kraman, how is it relevant?

5          MS. KRAMAN:  This is similar to the issue that we were

6     just discussing before we pursued VIZIO regarding the chain of

7     custody, you know, we should be able to assess -- you know, we

8     should be able to assess when they obtained things, you know,

9     the chain of how things happened.  I don't understand why it's

10    an issue.

11         THE COURT:  Mr. Kennedy?

12         MR. KENNEDY:  Yes.

13         THE COURT:  You know, again, I just don't think it

14    should be that hard for you to identify, because it probably

15    makes sense from the point of view of doing the inspection, why

16    you can't provide an Excel spreadsheet that these 30 model

17    numbers and the dates that you acquired them.

18         MR. KENNEDY:  Your Honor, is that the 30 model numbers

19    that we provided for infringing charts for VIZIO?

20         THE COURT:  I think so, yes.

21         Right, Ms. Kraman?

22         MS. KRAMAN:  Right, the charted products.

23         MR. KENNEDY:  The day we ordered the products?

24         THE COURT:  Well, the date acquired.  You can use your

25    imagination for that.  Whether it's the day you asked for it, or

1    the day it was delivered, I think if you are within a week,

2    nobody is going to complain.

3              So, what about this, why is it relevant to the date by

4    which plaintiffs first became aware of VIZIO's alleged

5    infringement?

6              MS. KRAMAN:  Well, I mean, we're -- we hadn't -- why is

7    it relevant to?

8              THE COURT:  To anything?

9              MS. KRAMAN:  It's relevant to understanding their basis

10   for filing this lawsuit.

11             THE COURT:  All right.

12             Well, that's not actually --

13             MS. KRAMAN:  And to their request for samples.  I mean

14   --

15             THE COURT:  All right.

16             Well, I'm going to deny that, because I don't think we

17   need to know what the basis was for why they filed this lawsuit.

18             So, I'm going to change it to say that plaintiffs must

19   immediately provide a -- I think it's a delete narrative.  A

20   response identifying the date -- sorry.  Identifying the model

21   numbers and dates acquired for all VIZIO products torn down

22   related to that determination.

23             I'm going to say, "torn down and charted," because I'm

24   not actually sure what the last chart means.

25             All right.

1        So, we think that is probably going to be a spreadsheet
2    with 30 things.
3        Just for -- Mr. Kennedy, what do you think, because
4    immediately is not actually a very helpful description?  When
5    are you going to provide this by?
6        MR. KENNEDY:  Next Friday, your Honor.
7        THE COURT:  That seems fair enough.
8        So next Friday is April the 8th?
9        MR. KENNEDY:  April the 8th.
10       THE COURT:  All right.
11       So, the next thing is this damages expert report served
12   in the Dell litigation.
13       And, as I understand it, everyone has agreed in
14   principle that this is something that but for confidentiality,
15   VIZIO gets, right?
16       MR. KIMBLE:  Yes, we're not contesting that.
17       THE COURT:  All right.
18       So, why don't we do this, because I don't actually
19   understand why -- I don't know what Dell's reaction is going to
20   be, so I'm just going to order that.
21       I take it, Ms. Kraman, it's not actually of pressing
22   importance that you get this, because presumably this is part of
23   what your damages expert is going to want to rely upon.
24       That's the main purpose of this, is that right?
25       MS. KRAMAN:  The main purpose is damages, yes.  We

1      would need it prior to expert discovery.

2            THE COURT:  All right.

3            So, why don't we say -- and I'm not going to make

4      either side redact.  What I'm going to do is, I'm just going to

5      order on a date, maybe about two weeks from now, for plaintiffs

6      to produce an unredacted copy.

7            And I'm going to order both sides to immediately notify

8      Dell that this is going to happen.

9            This would be attorney's eyes only, highest level

10     designation that there is in this case, although, I don't know

11     exactly what that is.  And if Dell has a problem, they can file

12     something here, or at least talk to the two of you.

13           But I think that in the first instance, this ought to

14     be on Dell rather than you all.

15           MR. BRAGALONE:  We agree, your Honor.

16           And I just want to point out, again, that Mayer Brown

17     and Mr. Beaber, himself, represented Dell.

18           THE COURT:  Mr. Beaber can send himself a memo.

19           MR. BRAGALONE:  Exactly.

20           MS. KRAMAN:  He no longer represents Dell, your Honor.

21           THE COURT:  All right.

22           Well, then, he can speak to somebody.

23           MR. BRAGALONE:  All I'm asking is, in view of the prior

24     relationship, there is a burden beyond a defendant to do that.

25           THE COURT:  Well, there's not much of a burden here.

1          Mr. Beaber doesn't represent Dell anymore, but you can
2     ask him during the next break who does.
3          But I'm asking both of you, just send an e-mail saying,
4     the Judge in Delaware has ordered us to do this, and the date
5     for doing this is, and let's make a date, because I don't think
6     we actually need to make Dell, if they want to get involved in
7     this, jump through a lot of hoops.
8          So, if we could say three weeks from this Friday, so
9     April 22nd?
10          Okay.  So, plaintiffs must produce -- what should I
11     call this thing to be accurate?
12          Dell's --
13          MS. KRAMAN:  Or plaintiff's damages of the
14     unredacted --
15          THE COURT:  Well, first off, do we know if there is one
16     report or two reports?
17          MS. KRAMAN:  Just the one.
18          THE COURT:  Okay.  Produce -- must produce plaintiffs'
19     damages expert report served in the Dell litigations -- oh,
20     there it is -- by April 22, 2016.
21          Both sides, meaning plaintiffs and VIZIO, must promptly
22     notify Dell of this Order, and the report to be given, pursuant
23     to the highest level of confidentiality designation, all right?
24     Does that care of that?
25          MS. KRAMAN:  It does, your Honor.

1          THE COURT:  All right.

2          Oh, yes, so then we have the hypothetical one, No. 5,

3    where plaintiffs were going to supplement a bunch of common

4    interrogatories by some agreement before I set the date here of

5    doing it on Friday, or some time in the middle of this, so

6    plaintiff wrote, or defendant wrote hypothetically, plaintiffs

7    responded somewhat, I don't understand.

8          MS. KRAMAN:  So, for most of these, I think we can cut

9    through, but I'm going to take them slightly out of order, if

10   that's okay with your Honor?

11         THE COURT:  Well, so, when you say "cut through," are

12   any of these that you are now satisfied with?

13         MS. KRAMAN:  There are several that we are satisfied

14   with.  We just want some confirmation from counsel.

15         So, for example, let me give you a for example.

16         THE COURT:  Okay.

17         MS. KRAMAN:  While the request related to common Rog 2

18   and Rog 10, in their contention interrogatories directed to

19   their contention on secondary considerations of indirect

20   infringement --

21         THE COURT:  Okay.

22         MS. KRAMAN:  They have now provided their narrative

23   responses, which, you know, they hadn't before, which -- so,

24   we're okay with that, that they finally have done that.

25   Provided that, you know, we just wanted to confirm that that is

1    the entirety of the bases for their contentions, because this is

2    the first time that we've gotten narrative responses.

3         So, we just want to make sure that, you know, with fact

4    discovery --

5         THE COURT:  The interrogatories, as written, say, you

6    know, provide all or something like that?

7         MS. KRAMAN:  That --

8         THE COURT:  So that the way they've answered it answers

9    your questions?

10        MS. KRAMAN:  I guess there is a question on why it took

11   so long to get the information, but we just want to make sure

12   that this the entirety of the basis for their contention, and

13   with counsel's representation that it is, then we're satisfied

14   with those two.

15        MR. KENNEDY:  I think that we're under to a duty to

16   supplement interrogatories if we receive additional information.

17   I don't know if we can agree with all certainty.

18        THE COURT:  But is your full answer based on what you

19   have right now?

20        MR. KENNEDY:  That's correct.

21        THE COURT:  Okay.  So, you said that was No. 5 and No.

22   10?

23        MS. KRAMAN:  No. 2 and No. 10.

24        THE COURT:  No. 2 and No. 10.

25        So, I'm going to cross them off, okay?

1          MS. KRAMAN:  Right.  And you can go ahead and cross off

2     No. 8 as well, under supplemental response.

3          THE COURT:  Okay.  No. 8.  That had to do with the

4     marking?

5          MS. KRAMAN:  Correct.  Again, it's --

6          THE COURT:  Okay.  I don't need to know any more.

7          So, that is leaves?

8          MS. KRAMAN:  5 and 6.

9          THE COURT:  All right.

10         5, which has something to do with the agreements that

11    I've denied you on.

12         MS. KRAMAN:  They provided a supplemental response

13    identifying licenses and charts.  And we are okay with their

14    supplement.  We just want to confirm -- there is a statement at

15    the end of the amended response to say that they're -- that

16    they're not withholding information, or, basically, they say

17    there that there might be information in an e-mail confirming

18    ███████████████████   ██████████ .

19         And we just want to make sure that everything in the

20    narrative response is there, regardless of where it might be

21    found.  We just want to make sure that that's the entirety of

22    their response.

23         THE COURT:  Mr. Kennedy?

24         MR. KENNEDY:  I believe that there may be three

25    licensees that we didn't have full information on at that point;

1       ███████████████████████

2              Besides that, I think we're that's correct.

3              THE COURT:  For those three, you're going to produce

4       something more?

5              MR. KENNEDY:  I think for those three, we can amend our

6       answers to include those, but it's just not --

7              MR. BRAGALONE:  Let me clarify this one, your Honor.

8              I do know about this.

9              So, with respect to those ████  ██████████████████

10      ██████████████████████████████  so we've given them

11      that.

12              ████████  ████  ████████  there is no License Agreement, so

13      there is nothing to list there.  They were dismissed and they

14      have been dismissed documents.  They're publicly available, to

15      our knowledge.

16              We did follow-up since the time that we supplemented

17      that on Friday and have since confirmed that there is nothing

18      else.

19              THE COURT:  All right.

20              Ms. Kraman.

21              MS. KRAMAN:  That's helpful.  That's not what I was

22      referring to --

23              THE COURT:  Okay.

24              MS. KRAMAN:  -- but that is helpful.

25              THE COURT:  Well, we helped on something you weren't

1    concerned about.

2          What is it exactly were you concerned about?

3          MS. KRAMAN:  On Page 24 of their supplemental response

4    -- and I have an extra copy if you need it, but I can read it

5    into the record, it's one sentence.

6          THE COURT:  Well, this is mostly a conversation between

7    you and Mr. Kennedy here where there's something that you're

8    concerned about and somehow, and, presumably, you have Page 24,

9    Mr. Kennedy?

10          MR. KENNEDY:  Yes.

11          THE COURT:  Okay.  So, summarize what it is.

12          MS. KRAMAN:  Sure.

13          THE COURT:  Hopefully, you were just talking to him not

14    me.

15          MS. KRAMAN:  So, essentially, it just said -- the

16    statement just said that they have no documents in their

17    possession, custody, or control, in parens "(other than

18    potentially electronic communications and e-mails confirming the

19    ██████████      ████████    ██    ██████████    ████████████,

20    ██    ████████████.)"

21          And we just want to confirm that they're not

22    withholding information based on that statement.

23          THE COURT:  I think I'm guessing the way I would

24    interpret that is, there's some limit on which you can get from

25    e-mail discovery, and they're just pointing out that they might

1    have something in an e-mail where they're kind of being extra-

2    cautious there.

3             But I'm just guessing.

4             MR. BRAGALONE:  That's correct, your Honor.

5             There is no document that we're withholding.  The way

6    the notification would typically come, would have been from

7    e-mail, but no e-mails were searched.

8             But there is no other document.  There's not a License

9    Agreement, in other words, so I think that --

10            THE COURT:  Okay.  Does that address your concern?

11            MS. KRAMAN:  I understand what he's saying about a

12   document, but this is an interrogatory asking for information,

13   so I don't know if he's saying that whether or not -- I'm

14   unclear whether it's means there's information -- there might be

15   information, they don't know, or they know, but it's an e-mail.

16            THE COURT:  I think there might be some information

17   somewhere they don't know.

18            MS. KRAMAN:  They either don't know it exists, or

19   they're just being cautious, or they know it exists, and it's in

20   an e-mail.  I don't know which statement.

21            THE COURT:  All right.

22            I think I understand what you're saying.

23            I take it -- well, Mr. Bragalone, do you understand

24   what Ms. Kraman was just saying?

25            MR. BRAGALONE:  I think so, your Honor.  There's

1    nothing we're withholding, your Honor, that I'm aware of, but we

2    didn't go through an exhaustive search of e-mails, because no

3    one has in this case, your Honor.

4         THE COURT:  All right.

5         So, I think that sounds like your question is answered?

6         MS. KRAMAN:  Correct, your Honor.

7         THE COURT:  Then I'm going to cross out No. 5.

8         All right.

9         No. 6?

10        MS. KRAMAN:  No. 6.

11        Plaintiffs essentially respond that they didn't have

12   access to sales numbers from defendants in prior to litigations,

13   and then point to two PowerPoint presentations that were

14   produced late Friday night as responsive -- as to what Mr. Vella

15   was testifying about when he testified about plaintiffs

16   researching sales data.

17        And the two PowerPoint presentations that were produced

18   simply cannot be what Mr. Vella was testifying about.  They're

19   from Rambus in early 2013, before the patents were acquired by

20   Acacia, and before any these lawsuits were commenced, any

21   lawsuits on the patents, so there can't be this internal --

22        THE COURT:  Mr. Vella is an Acacia person?

23        MS. KRAMAN:  He was the President of IDT at the time.

24        THE COURT:  Okay.  I didn't know who he was.

25        MS. KRAMAN:  So, it can't be the informal Acacia market

1      research that Mr. Vella was talking about.

2            And certain things are redacted for privilege.  It's

3      unclear what the basis of that privilege would be, since the two

4      parties to the presentation would have been adverse

5      counterparties in a contract negotiation.

6            But, regardless, what we're requesting and what Mr.

7      Vella testified about --

8            THE COURT:  What did Mr. Vella say exactly?

9            MS. KRAMAN:  That plaintiff researched sales data

10     before entering into licenses or settlements under the

11     patents-in-suit.

12           THE COURT:  All right.

13           Any response from plaintiff here?

14           MR. KENNEDY:  So, your Honor, the first presentations

15     that were produced on Friday night is incorrect.  They were

16     produced well before.

17           What we produced was a spreadsheet that shows some

18     revenues based on market segments like --

19           MS. KRAMAN:  That's correct, I misspoke.

20           MR. KENNEDY:  -- LG, LCMs and also laptops and phones.

21           THE COURT:  This is for some other defendant, right?

22           MR. KENNEDY:  No.  This is just general revenue

23     knowledge regarding --

24           THE COURT:  For the industry?

25           MR. KENNEDY:  For the whole industry.

1           So, that's one part of the presentation.

2           The second part of this presentation is broken down by

3    company within that segment.

4           So, maybe Apple sold -- or laptops to Apple, Toshiba,

5    Dell, and HP, and all of their projected revenues --

6           THE COURT:  Right.  So, what you're telling me is, you

7    produced that.

8           MR. KENNEDY:  Yes, we produced that, so I think that

9    that's -- I think that's sufficient.  I don't know --

10          THE COURT:  But you think that corresponds to what Mr.

11   Vella talking about?

12          MR. KENNEDY:  I think.  I believe so, your Honor, yes.

13          MS. KRAMAN:  I'm confused.

14          MR. BRAGALONE:  I prepared him for deposition and

15   that's exactly what he was talking about, yes.

16          MS. KRAMAN:  I'm confused that Mr. Kennedy was privy to

17   the contents of the PowerPoint presentations or what was in the

18   production Friday night.

19          MR. KENNEDY:  No.  The PowerPoint presentations were

20   produced not Friday night.

21          MS. KRAMAN:  No, I know that.  I guess -- I'm sorry.

22          MR. KENNEDY:  Those numbers weren't produced on Friday

23   night.

24          MS. KRAMAN:  What you were just referring to, as far as

25   the revenue breakdown, did that refer to the -- were you just

1    talking about what the data that was produced Friday night?

2              MR. KENNEDY:  No.

3              MS. KRAMAN:  You're talking about the PowerPoint

4    presentations?

5              MR. KENNEDY:  Correct.

6              THE COURT:  And what I'm gathering Mr. Kennedy was

7    saying is that the spreadsheets with industry and company

8    breakdowns were produced some time before Friday night?

9              MR. KENNEDY:  Some time well before Friday night.

10             But the numbers that DDG0 --

11             THE COURT:  Well, no, no, I --

12             MR. KENNEDY:  I know by the numbers they were produced.

13             THE COURT:  All right.

14             So, the documents that he's referring to, have you seen

15   them?

16             MS. KRAMAN:  I'm not sure what he's -- I'm still not

17   clear.

18             MR. KENNEDY:  I'm referring to the two documents that

19   are cited in our Rog response, updated in our Rog response.  We

20   said we were going to update them, the two documents that are

21   cited in our --

22             MS. KRAMAN:  And the two documents that are cited in

23   your Rog response are not the PowerPoint presentations that I

24   was referring to?

25             MR. KENNEDY:  No.  They are.

1          MS. KRAMAN:   Okay.  So, now, that that's clear --

2          THE COURT:   Maybe it doesn't have to be.

3          MS. KRAMAN:   So, what Mr. Kennedy was just saying in

4    reference to the PowerPoint presentation, those -- everything I

5    said still applies.  They can't possibly be the data research,

6    because this was done before any lawsuits were commenced, before

7    the patents were acquired.

8          So it can't refer to the sales data that are basically

9    underlie or based into the -- that underlie the lump-sum royalty

10   that they came up when they licensed the patents-in-suit and

11   settled with parties.

12         And that's what we're looking for.  We should be able

13   to assess the inherent royalty rate that's baked into the lump

14   sum.

15         THE COURT:   And let me just see -- I want to make sure

16   before I hear from Mr. Bragalone what you're saying.

17         You're saying these PowerPoints are somebodies, perhaps

18   IDT's presentation to some company they want to take a license

19   or Settlement Agreement, and you think that the redacted portion

20   contains estimates of the potential licensees' volume of sales,

21   or income, or something, that might be relevant to calculating

22   the royalty or am I --

23         MS. KRAMAN:   The PowerPoint presentations are between

24   Rambus and Acacia.  They're for January 2013.  And it's titled

25   "Working with Acacia to Realize the Value in Rambus's Diamond

1    Portfolio."

2              THE COURT:  Okay.  I understand.

3              Mr. Bragalone?

4              MR. BRAGALONE:  That's the information Mr. Vella was

5    referring to.  We confirmed that later.

6              THE COURT:  Well, no, no.  I think her complaint is not

7    about that.  I think it's about redactions, or am I wrong?

8              MS. KRAMAN:  Well, there are redactions for privilege,

9    but what we're saying is we still don't -- we don't think we've

10   gotten the data that we've asked for.

11             MR. BRAGALONE:  So, and that's what I was applying it

12   to.  They absolutely have the data.  That's exactly what it is.

13             THE COURT:  The data is what Mr. Kennedy was taking

14   about.

15             MS. KRAMAN:  So, Mr. Kennedy was talking about the

16   PowerPoint presentations?

17             MR. BRAGALONE:  The PowerPoint presentation is the

18   data --

19             MS. KRAMAN:  The same data?

20             MR. BRAGALONE:  -- that Mr. Vella talking about it.  It

21   is the publicly-available information.

22             THE COURT:  Well, Ms. Kraman, do you still have a

23   problem here?

24             MS. KRAMAN:  Mr. Bragalone just made a distinction.

25   It's the publicly-available information.

1              MR. BRAGALONE:  Fair enough.  It was available

2      internally to Acacia and IDT.

3              I don't know whether it was publicly available.  It

4      probably wasn't publicly available, because they got it from

5      various services.

6              My point is, there is no information.  We're not

7      withholding any other information.

8              THE COURT:  Okay.  Well, that's kind of what I thought

9      is, between one thing or another, we're representing that what

10     Mr. Vella was talking about, you've got.  And something else,

11     and I don't know why it was brought up, but something else that

12     provides information, you got that, too.

13             I'm trying to figure out what's left here, if anything.

14             MS. KRAMAN:  We never received any data that underlies

15     the -- how the lump-sum amounts in the licenses, how those

16     specifics that they got underlying those amounts.

17             And if they're saying that it doesn't exist, you know,

18     then, I guess, I don't know what to say.

19             But we've never received that information.  If they say

20     it's the PowerPoints, we don't understand how that could be so.

21             THE COURT:  Well, I got the impression from what Mr.

22     Kennedy was saying -- well, anybody from the plaintiffs, do you

23     understand, because I'm not sure I do, what Ms. Kraman was --

24     what we're talking about here?

25             MR. BRAGALONE:  Your Honor, I think they're assuming

1    some category of information that we're not even aware of.  We

2    responded based upon the information that was internal that they

3    had available.  They had this document for a long time.  They

4    didn't bother to show it to Mr. Vella.

5          Had they done so, he would have been able to confirm

6    that, yes, that's the information.

7          MS. KRAMAN:  Mr. Lo wanted to add one point?

8          THE COURT:  Mr. Lo, good afternoon.

9          MR. LO:  Good afternoon, your Honor.

10         One point of clarification on this.

11         While it's helpful what Mr. Bragalone and Mr. Kennedy

12   said about the two PowerPoints, what we wanted in the

13   interrogatory was beyond that.

14         I'll try to speak in a little bit of generalities,

15   because we're on the public record.

16         The plaintiff have entered into a series of agreements

17   ranging in amounts and with various size companies.  All those

18   agreements were done in a lump sum format, so there are no

19   running royalties.

20         At some point, before they entered into those

21   agreements, for every agreement they entered into, they must

22   have decided, okay, I think these guys have sold approximately a

23   million dollars worth of infringing goods, $10 million of

24   infringing goods, a hundred million dollars of infringing goods,

25   and that's why there's a distinction in the lump sum of each of

1    these various either defendants or counterparties.

2           That's what we want.  We want the internal data that

3    they had access to before they entered into each of those lump

4    sum agreements, which will then allow us to reverse engineer

5    their thinking, in terms of why did I -- I'm just taking random

6    numbers -- this is not actually a settlement -- why did they

7    enter into a $400,000 settlement with this particular party?

8    What were their assumptions going into that negotiation and

9    accepting that particular amount?

10          That's the underlying data which they must have had,

11   which we're asking for.

12          THE COURT:  All right.

13          You're basically asking for something that you don't

14   actually know whether they have or don't have.

15          But I understand what you're asking and I've heard

16   parties talk about this sort of thing before.

17          Mr. Bragalone or?

18          MR. BRAGALONE:  Sure.  Your Honor, the reason, for

19   example, that we would have settled with a party for

20   six-and-a-half million dollars is because they said they

21   wouldn't pay us seven.

22          THE COURT:  Well, I understand that kind of logic goes

23   on, too.

24          MR. BRAGALONE:  But more to the point.  You know, while

25   plaintiffs' counsel, their outside counsel did have access to

1    financial information and sales information, that was never

2    shared with plaintiffs.  There was never any analysis by

3    plaintiffs of that information in connection with their

4    settlement decisions, because that would violate the

5    Confidentiality Agreement.

6         I think there has been a good deal of speculation.

7         THE COURT:  What you're saying is, there is no response

8    of non-privileged information here?

9         MR. BRAGALONE:  I think that said it better than I did.

10   Thank you, your Honor.

11        THE COURT:  Mr. Lo, that seems like a reasonable --

12   that seems like a reasonable -- that's plausible.

13        MR. LO:  Right, yes.  So, let me take a couple of

14   scenarios, because I don't know which one or ones Mr. Bragalone

15   was referring to.

16        If outside counsel went out and found their own

17   materials for the purpose of entering these settlements, I think

18   there's probably a legitimate claim to privilege or work

19   product.

20        If, however, the other side, for example, produces to

21   you hearsay spreadsheets showing what our sales are, now, let's

22   negotiate a number, I don't think that there's any claim for

23   privilege for that.

24        And they're not saying that they never got that.  And

25   so, what I'm trying to figure out is, what exactly is out there,

1    and if there is a particular claim to privilege, what is the

2    foundation of that claim?

3         THE COURT:  So, you want the sales information provided

4    by the other 11 defendants in these cases?

5         MR. LO:  Correct.  If they've done internal studies.

6         So, if there's publicly-available data that they pulled

7    prior to entering into those, those are not --

8         THE COURT:  Well, I think we kind of got that IDT

9    didn't do this.

10        And to the extent that Mr. Bragalone and his firm did,

11   that's privileged.

12        MR. LO:  Fair enough.  But I don't know whether he said

13   their client never did that.

14        THE COURT:  Oh, I think just said that the client never

15   did that.

16        MR. LO:  Okay.  That's fair enough.  I'll take that

17   representation.

18        THE COURT:  All right.

19        So, are you asking that I order them to produce the

20   highly-confidential sales information they got from all the

21   other defendants?

22        MR. LO:  If that was something that was relied upon in

23   the negotiations.

24        THE COURT:  Well, I think what Mr. Bragalone is saying

25   is -- and it strikes me as, again, quite plausible is... that's

1    probably one of the things that factored into the law firm's

2    calculation of what they could settle the cases for?

3         MR. LO:  That's correct.

4         So, Mr. Bragalone came up here and said, look, we

5    accepted six, because they wouldn't give us seven.

6         If that's how they reached into it -- into the

7    Settlement Agreement, I'm fine with that, if that's their

8    preparation, but I don't think --

9         THE COURT:  Well, I mean, you know, it's a combination

10   of things.

11        MR. LO:  Exactly.

12        THE COURT:  And so, what I'm trying to figure out is, I

13   take it that the actual Settlement Agreements with all the other

14   litigation that's been produced, right?

15        MR. LO:  Correct.

16        THE COURT:  And you have this information about market

17   share, and the thing that Mr. Kennedy was talking about in his

18   spreadsheet, right?

19        MR. LO:  We do have the two spreadsheets.  I think they

20   are the PowerPoints that were referenced, yes.

21        THE COURT:  And so, in these other pieces of

22   litigation, the plaintiffs presumably accused other products,

23   got information from defendants as to how much sales of these

24   accused products they had, right?

25        MR. LO:  That's my presumption.

1          THE COURT:  All right.

2          So, Mr. Bragalone, if there is a pattern in terms of

3     the settlements relative to the amount of sales of accused

4     products, wouldn't that be something that the damages expert

5     would take into account?

6          MR. BRAGALONE:  Your Honor, I can't speak for what

7     their damages expert might or might not do.

8          But I will tell you that, at no point was any -- first

9     of all, to my knowledge -- but I'll back-up here -- that no

10    party with whom we've settled shared with our client's any sales

11    information.  That does sometimes happen, so that does sometimes

12    happen.

13         THE COURT:  But did they produce any to you in

14    discovery?

15         MR. BRAGALONE:  I'm sure they -- well, not in all

16    cases, but if it got to that point where we had financial

17    information that was produced, my law firm would have received

18    something, yes.

19         THE COURT:  Well, right.  So presumably what the other

20    side -- it may be confidential, but it is not privileged.

21         MR. BRAGALONE:  It's more than confidential to extent

22    the litigation is over.  We are obligated under those orders.

23         THE COURT:  Well, okay.  It's one thing to say, yes, we

24    had it, but we don't have it any more.

25         MR. BRAGALONE:  Right.  And we also wouldn't have

1        communicated it to our clients.

2               THE COURT:  No, no, but I mean -- here's what I -- this

3        strikes me as a plausible scenario.

4               Whoever is making the decisions, so let's not make it

5        -- it doesn't really matter who, but you have a licensing

6        strategy, or the plaintiffs actually have a licensing strategy,

7        and you're trying to plot the lump-sum licenses roughly into how

8        how much infringing, accused infringing sales there have been

9        within the relevant damages period.

10              And I'm guessing while there might be things that

11       causes a skew here and there, that, in fact, generally speaking,

12       some more accused products the defendants sold, the larger the

13       lump-sum license they took?

14              MR. BRAGALONE:  Your Honor, that assumes a level of

15       detail and analysis that I don't think that necessarily is the

16       case.

17              The defendants are trying to do something here, I

18       think, that really just isn't -- isn't even plausible under the

19       information that we have.  We've given them all the information

20       that we had.  We've given them the information --

21              THE COURT:  When you say you've given them all the

22       information we've had, what information about what?

23              MR. BRAGALONE:  That the plaintiffs had, your Honor,

24       the internal information --

25              THE COURT:  Okay.

1           MR. BRAGALONE:  -- that the plaintiffs had.  We

2    provided that to them.  They actually already have that.  They

3    had the opportunity to ask the witnesses about it.  They didn't.

4           So, we provided that information, we provided the

5    narrative response.  As a matter of course, we don't share, you

6    know, our knowledge of sales with our clients.  We're prohibited

7    from doing that.

8           THE COURT:  No, and I believe you on that.  That's not

9    an issue at all to me.

10          You know, there was another case that I had where

11   plaintiffs sued 60 different people.  They had a grid that

12   described, you know, based on the passage of time and sales

13   volume, you know, how much the settlements would be for.

14          And they were, I guess, at a number where they were

15   reasonable, and so, you could, I believe, at least until the

16   very end, have probably plotted those things and drawn something

17   that was not exactly a straight line, but was close enough.

18          That's what I think Mr. Lo is asking for here.

19          MR. BRAGALONE:  We don't have a grid.

20          THE COURT:  No, I understand.  And he wouldn't get the

21   grid, even if you had one.

22          You know, using Special Assessments in damages report,

23   you have to do some -- you have to look underneath and try it

24   figure out what's going on.

25          So, you know, I recognize that most of the cases were

1    settled a while ago.

2         How long do you retain discovery after you settle a

3    case before you give it back, you know, after the confidential

4    and stuff like that is destroyed?

5         MR. BRAGALONE:  Sure.  So, usually it's specified in

6    the agreement.  It varies from 30 to maybe 90 days at the

7    longest, I would say, but --

8         THE COURT:  So, what you're saying is, you wouldn't

9    have any of this information, because all these settlements are

10   more than 90 days old?

11        MR. BRAGALONE:  That's correct, your Honor.

12        THE COURT:  All right.

13        Well, based on that representation, I'm sort of

14   prepared to deny this request.

15        Mr. Lo, do you have something to say as to why?  I

16   mean, am I misunderstanding what you're trying to do or

17   something else?

18        MR. LO:  No.  Just one point of clarification.

19        While there are corresponding RFPs, we're moving on an

20   interrogatory.

21        So, the fact that they destroyed the documents, if they

22   still have the information, we want it.

23        If they're representing that the documents are

24   destroyed, and nobody remembers --

25        THE COURT:  Well, how can you remember what the sales

1    of 15 accused products were over 12 years?

2            Nobody could possibly remember that.

3            MR. LO:  They may not and I'm not suggesting that they

4    do.

5            I'm just simply saying, it's an interrogatory, and if

6    that's the representation, I'm prepared to accept it.

7            THE COURT:  Okay.  Well, I think that is the

8    representation.

9            Right, Mr. Bragalone?

10           MR. BRAGALONE:  Yes, we have not retained any of that

11   confidential information.

12           THE COURT:  And besides from not retaining it, none of

13   you have a photographic memory that would allow you to spit it

14   out, is that right?

15           MR. BRAGALONE:  That's correct.

16           THE COURT:  All right.

17           I'm going to cross that one off, too.  I'm going to

18   sign this.

19           All right.

20           We're down to the last one here, which is plaintiffs'

21   request of VIZIO.

22           First off, let me just ask.

23           It's 1:00 o'clock.  Does anybody want to break for

24   lunch?

25           MR. BRAGALONE:  We think we can do this fairly quickly,

1    your Honor.

2         THE COURT:  Okay.  I'm just asking.  Sometimes people

3    for medical or other reasons want to break for lunch.  If

4    there's anybody that wants to break for lunch, we'll break for

5    lunch.  Otherwise we'll just keep going.  Don't be embarrassed.

6         Okay.  All right.

7         Well, at least the good news is, there's only three of

8    them.

9         The third one is the one that I've already ruled on in

10   the other two cases.

11        So, just to make myself happy, I'm going to change that

12   one right now, which is by April 30 VIZIO will limit the number

13   of prior art publication references to ten per patent.

14        All right.

15        Mr. Kimble?

16        MR. KIMBLE:  Yes, your Honor.

17        So, the first set of requests have to do with

18   documents, I mean, they're really very related.

19        The first is that set of three.  It's market share

20   information.  We've actually talked about this with you.  It's

21   been some months ago.

22        At that time the Court just said, it wasn't time to

23   decide it at that point.  We are more focused on contentions.

24        So, what we would ask for is the market share documents

25   that VIZIO has, that we learned through the depositions that

1    they have these display search reports.  We understand that

2    those are, you know, not the level of LCM, which is --

3              THE COURT:  And why do you want market share?

4              Let's assume VIZIO sells 5 percent of TVs.

5              Would it make any difference to you if they sold 3

6    percent of the TVs?

7              MR. KIMBLE:  So, yes.  I think, my understanding is

8    that the damages experts can take into account market share.

9              Look, I don't know, as I sit here, whether our damages

10   expert, once he hopefully receives these, will decide to rely

11   upon them.  But I think he should have the opportunity to look

12   at it.

13             We think it's relevant.  It may or may not be

14   admissible.  And there's no burden here, because they have the

15   documents.

16             And so, it's relevant, at least to Georgia Pacific

17   Factor 11, so, yes, I think they're relevant.

18             The one thing I would say, just to anticipate an

19   argument is that the reports are something that they purchased

20   from a third party, and so, they paid for them.

21             THE COURT:  I don't care about that.

22             MR. KIMBLE:  Okay.  I think that's what I have to say

23   about market share.

24             Do you want me to cover the other two document-related

25   ones, and then let them talk, or just go one-by-one?

1          THE COURT:  Oh, okay.  Hold on just a minute.

2          I think these letters --

3          MR. KIMBLE:  I was following our proposal.

4          THE COURT:  No, no, no, I appreciate that.  It confused

5     me the way I organized myself for this.

6          All right.

7          Go ahead.  Address the other ones, Mr. Kimble.

8          MR. KIMBLE:  In all three of these, again, these are

9     documents that we know exist based on the depositions that we

10    took, so it's not what I'm speculating here.

11         Sales forecasts.  We know that a certain department at

12    VIZIO is just forecasting time-to-time.

13         THE COURT:  Well, is this -- is the -- is this in

14    support of your analytical approach to damages?

15         MR. KIMBLE:  But it could also be -- it could also

16    apply to certain Georgia Pacific factors, so -- but, yes,

17    forecasting I think is most usually thought of in connection

18    with the analytical approach that we talked about with your

19    Honor before.

20         THE COURT:  And so, one of the things the defendant

21    said was, well, if you are doing that, then the hypothetical

22    negotiations in 2010, and so, the -- 2010, is the relevant year

23    for these forecasts --

24         MR. KIMBLE:  Well --

25         THE COURT:  -- under the analytical approach.

 1            MR. KIMBLE:  -- I feel like that perhaps assumes too

 2    much.

 3            Sorry to look back, but I was thinking that it may be

 4    that that turns out to be what the experts say is the

 5    hypothetical negotiation date, but I think that that

 6    determination doesn't need to be made now or decide whether to

 7    produce the information.

 8            Again, it may not be useful to an expert.  It may not

 9    be --

10            THE COURT:  So, you haven't, in some contention

11    interrogatory or something said, what do you think the

12    hypothetical negotiation date is?

13            MR. KIMBLE:  I'm not remembering now.  I don't think

14    so.

15            THE COURT:  All right.

16            MR. KIMBLE:  I don't think so.  And, again, you know,

17    we understand that these forecasts are prepared at VIZIO and

18    that they have them.

19            THE COURT:  I've got the sales forecasts and then the

20    cost information for the accused products.

21            MR. KIMBLE:  Yes.  So, this is particularly simple.

22            They produced a revenue spreadsheet.  They did not

23    include cost information, you know, that's not in dispute.

24            This is the cost of -- in VIZIO's case, they acquired

25    the televisions and --

1          THE COURT:  Right.  I got how they work.

2          So, you said you would be quick here, so why don't I

3     hear from VIZIO.

4          I think I got your view.

5          MR. KIMBLE:  Yes, sir.

6          THE COURT:  Mr. Lo?

7          MR. LO:  Sure.

8          All of these documents on the market share and on the

9     cost information are going to be at the level of the

10    televisions.

11         I mean, when we were before the Court in November --

12         THE COURT:  Right.

13         MR. LO:  -- the Court expressed scepticism, I think,

14    appropriate skepticism, that with the accused functionality of

15    the LCM, you get any kind of cost information, or profitability

16    information, on the overall product.

17         What the Court said in November -- and it was really at

18    plaintiffs' prompting was -- plaintiffs said, well, I could

19    prove this under the analytical method.

20         And I think the Court said, well, I'll not sure that

21    that's true, but maybe you can.

22         THE COURT:  Actually what it said, I believe is, I

23    don't know what you're talking about.

24         MR. LO:  Right.

25         THE COURT:  But I did since get some information on

1    that.

2           MR. LO:  So, when plaintiffs raised the issue again, I

3    expected the plaintiffs to actually demonstrate that the case

4    law and the analytical method allows you to look at the overall

5    profitability of the overall product, even after --

6           THE COURT:  Well, and so, Mr. Lo, I did actually go

7    back and reread part of the transcript of when we discussed this

8    before, and I did make a note to myself here that I put it off.

9           Using that as a good policy, but here it has come up

10   again, so it's not such a good thing.

11          How much of a burden is it to produce these things that

12   they're asking for?

13          MR. LO:  On the cost, it is a burden.  It's not

14   something that the company typically produces in litigation for

15   that very reason.

16          THE COURT:  Well, so isn't the cost something that you

17   would expect a large company like VIZIO to be able to push a few

18   buttons on a computer and generate that information?

19          MR. LO:  At some level, yes.  We obviously can generate

20   cost information.

21          THE COURT:  Okay.

22          MR. LO:  Overall, I don't know if we do it down to a

23   product, but obviously as an overall company, we do have cost

24   information.

25          THE COURT:  Okay.  And so, you were starting to say how

1    that was burdensome, but let's assume for the sake of argument

2    that I'm not persuaded.

3         What about these other two things; the market share

4    documents and the sales forecasts?

5         MR. LO:  The market share is probably less of burden

6    than the sales forecast.  The sales forecast, we would just have

7    to dig around.  I don't know that they are all in a single

8    location.

9         THE COURT:  Mr. Lo, so here's what I'm inclined to do,

10   which is -- and I appreciate that Mr. Lo has been, you know, not

11   jumping up and down and the house will fall down if I ordered

12   the production of this.

13        I tend to think, from what I saw, that it's going to be

14   difficult for plaintiffs to use this information whether it's an

15   analytical approach or whether it's some kind of George Pacific

16   approach.

17        But I do think that apportion, if that is the way they

18   go, you've got to start somewhere.  And since you don't sell

19   LCMs, I think that -- I think you ought to produce these

20   documents.

21        And if we get to that point, you know, there will be

22   some Daubert Motion by other experts violating every rule that

23   the Federal Circuit's ever made, and we'll decide it at that

24   point, but I think preventing them there trying is not the right

25   way to go.

1            So, Mr. Lo, the way the Order is drafted, within ten

2    days of this Order, and at least one week before VIZIO's

3    additional 30(b)(6) witness is deposed, VIZIO is ordered to

4    produce one market share document, including documents from

5    display search stored on VIZIO's servers.

6            Two, sales forecasts.

7            And, three, cost information for the accused products.

8            Is there any problem with the way that's written in

9    terms of your ability to comply?

10           MR. LO:  Well, can I get a clarification on the Court's

11   Order?

12           So, I heard what the Court said about cost information.

13           With respect to sales forecasts, they obviously know

14   the date of the hypothetical negotiation, or can they at least

15   tell us the year of the hypothetical negotiation, so we can be

16   at limited as to when that occurred.  There can't be too many

17   choices here.

18           THE COURT:  You said 2010.  I wasn't entirely sure that

19   -- and these patents are expired?

20           MR. LO:  They're expired.  2010 is the first time, I

21   believe, any of accused products were sold.

22           THE COURT:  Well --

23           MR. LO:  Your Honor, I'll put it this way.

24           If they want to come to us and say, you know what, the

25   date should be 2011.  We'll give them 2011.

1          I'm just saying, let them pick a date and I'll go with

2     that date.

3          MR. BRAGALONE:  We can give them something right away

4     on that.

5          THE COURT:  Okay.  All right.

6          Well, basically in terms of sales forecasts, we're

7     talking about forecasts from whatever year it is that they pick,

8     right?

9          MR. LO:  I'm sorry.  I meant for the year at the time

10    of the hypothetical negotiation, not since then.

11         THE COURT:  Right.  And you said it more clearly than I

12    said it, but that's what I intended to say, okay?

13         All right.

14         Anything else?

15         MR. LO:  Yes, and then with the market share, the

16    opposition we had was maybe that -- none of these are

17    necessarily high in the accused products.  In fact, they go

18    beyond the accused products.

19         THE COURT:  They're just VIZIO market shares of what?

20         MR. LO:  It could be anything.  It could be

21    televisions, it could be LCDs, it could be speakers.  That's why

22    they're not relevant, and that -- that portion of it, figuring

23    out what exactly it is that we need to produce is burdensome to

24    us.

25         When we had previously been before the Court, we said,

1     if there were any market share data that related specifically to

2     any of the accused products, we would go looking for those, and

3     we would produce them.

4          But at a company of VIZIO's size, it's entirely

5     possible that we get random market share information, you know,

6     from a creditor or non-creditor sources.

7          THE COURT:  All right.

8          Mr. Kimble, or whoever was speaking, what market share

9     information exactly are you looking for?

10         MR. KIMBLE:  We're talking about market share -- we're

11    talk about market share information relating to the products

12    that are in suit.

13         And I realize that they may not name the particular

14    charted products, but we're talking about the TVs, okay?

15         We're not talking about -- there's something else,

16    speakers.  And we know it may be at a high level, and that's

17    similar to what we saw or what we were discussing a minute ago

18    with Mr. Vella -- Mr. Vella referenced in the Rambus report --

19    presentations.

20         THE COURT:  All right.

21         So, high-level TV marketing surveys.

22         Do you have anything to say about that, Mr. Lo?

23         MR. LO:  If it's limited to market share data involving

24    VIZIO for televisions, I think that I can probably do a search

25    for that.

 1                    THE COURT:  Okay.  All right.

 2                    So, my Order -- I'm not going to change what it says,

 3          but the year to be named later that's implicit in what we're

 4          talking about here.

 5                    Is there anything else, Mr. Lo, on No. 1?

 6                    MR. LO:  Not on No. 1.

 7                    THE COURT:  Let's go to No. 2, which is the additional

 8          30(b)(6) witness.

 9                    MR. KIMBLE:  Well, first of all, we would ask for

10          additional testimony on whatever documents they produced based

11          on what we just discussed.

12                    Other than that, I think the most important issue here

13          is, we've identified three categories of document collection;

14          License Agreements, infringement, invalidity, and

15          investigations.

16                    The issue is that --

17                    THE COURT:  Well, so, one of the things that they said

18          was that Mr. Brinkman -- that you were complaining about wasn't

19          designated to testify on any of these topics?

20                    MR. KIMBLE:  Yes, so, I think that -- this is a little

21          bit of semantics.

22                    I mean, he was designated on topics.  I think what they

23          are saying is, based on their objections, he wasn't designated

24          on the topics.  Not that --

25                    THE COURT:  Well, in other words, you tried to

1    designate him, they said, no, and I guess the issue was not

2    resolved?

3            MR. KIMBLE:  Well, right.

4            So, for example -- all right.

5            THE COURT:  Well, so, wait.  Just hold on because maybe

6    we don't need examples.

7            Mr. Lo, is this a fair characterization?

8            MR. LO:  That's part of it, but there are others where

9    we say that regardless of our objection, the questions were not

10   within the scope.

11           But if your Honor has --

12           THE COURT:  Well, I guess, in other words, this is not

13   a case where you said, we have some other 30(b)(6) witness who

14   is going to testify on these topics, you said these are just

15   improper topics?

16           MR. LO:  Correct.

17           THE COURT:  Okay.

18           MR. KIMBLE:  Well, so, our view was, and we've attached

19   some examples of this.  But that they were just overly

20   aggressive in preventing questions about what investigations

21   they had done not during this case, but before this case.

22           THE COURT:  You know, I looked at Mr. LaMagna.  I take

23   it he's not here, right?

24           MR. LO:  He is not here, your Honor.

25           THE COURT:  Okay.  When I looked at that, that was not

1   a transcript that gave him much credit, in my opinion.  But I

2   also understood that at some level why he was being as --

3   interjecting as he was, given that I think in particular I was

4   thinking in relation to these infringement and validity

5   investigations, going back and forth on law firms and such.

6          So, you know, it didn't look like the kind of thing you

7   would want to have published somewhere, but I didn't think it --

8   I've seen worse.

9          MR. KIMBLE:  Just to cut through it.  Here's what I

10  think is the best example.

11         So, VIZIO has certain OEMs that they're selling in

12  these TVs, right?

13         THE COURT:  Okay.  Wait.  OEM is an original what?

14         MR. KIMBLE:  Original design manufacturer.

15         THE COURT:  Okay.  All right.

16         Thank you.

17         MR. KIMBLE:  So, and an example of that -- well, maybe

18  I'm not prepared to make this on the record -- but, in any

19  event, they have a relationship, one in particular, you know,

20  they were in communications with.

21         We wanted to know about their communications with the

22  OEM, relating to the patents-in-suit, and they asserted

23  privilege.

24         We don't think that they allowed, even the witness, to

25  testify as to establishing any kind of privilege.  There's no

1    agreement that has been produced.  There has been -- I don't

2    understand how the privilege work.

3            And so, another --

4            THE COURT:  I'm sorry.

5            You don't understand how what is privileged?

6            MR. KIMBLE:  Those discussions between VIZIO and the

7    OEM relating to -- and this is several years predating this

8    lawsuit, or some during this lawsuit, either way -- relating to

9    the patents that are in suit and their products.

10           And so, what we had -- what we were trying to do in the

11   deposition was, you know, figure out the background of the

12   privilege, if there really is a privilege, and we don't think

13   that we were allowed to fairly cover that based on the

14   objections that were laid.

15           So, we would ask for another deposition to fully

16   understand the scope of that relationship, for example, and as

17   well as the other topics that we've identified in our Proposed

18   Order.

19           THE COURT:  All right.

20           Thank you, Mr. Kimble.

21           What do you have to say, Mr. Lo?

22           MR. LO:  With respect to the topic of communications

23   with the OEM, I don't think that that was fairly designated in

24   any portion of Mr. Brinkman's deposition.  They have not set

25   forth a topic in their letter to the Court setting that forth.

1          THE COURT:  All right.

2          I take it that falls under infringement and validity

3     investigations?

4          MR. LO:  Well, if it does, our -- we've recommended to

5     them and to the Court that there are no non-privileged --

6          THE COURT:  Well, I thought I saw somewhere, and maybe

7     it was in your letter, or maybe it was in the testimony, or

8     maybe in the record by Mr. LaMagna, but I thought I saw

9     somewhere that there was no investigation.

10         MR. LO:  It's true.  There was no investigation.  And

11    we have made clear that -- nor do we ask any of our suppliers to

12    conduct an investigation on our behalf.

13         THE COURT:  All right.

14         Well, to me that sort of takes care of the 32 to 34,

15    infringement and validity investigations, so I'm going to cross

16    that one out.

17         What about License Agreements, which I've now

18    forgotten.  Are they this Atratech?

19         MR. LO:  That's correct.

20         THE COURT:  Which you said is a cold cathode tube?

21         MR. LO:  That's correct.

22         THE COURT:  Whatever that is.

23         Is that a -- well, I take it that sounded like some

24    earlier art?

25         MR. LO:  It is.  It's earlier technology.

1          THE COURT:  And what exactly, Mr. Kimble, was the --

2     stay around, Mr. Lo -- what was your complaint about the

3     Atratech?

4          MR. KIMBLE:  We wanted to know what products were at

5     issue, you know, what were the products that were covered.

6          Keep in mind, VIZIO produced one License Agreement.

7     They made a self-determination about what's relevant.  They

8     apparently think that --

9          THE COURT:  Atratech is the one License Agreement that

10    published or produced?

11         MR. KIMBLE:  Actually, yes.  And that's one that we had

12    found -- pointed them to, actually, and then produced it.

13         In any event, my point is, we wanted to know what

14    products were at issue, and we wanted to know whatever

15    information they had about, you know, how -- and this kind of

16    goes to the discussion of --

17         THE COURT:  Well, you now have the Atratech license?

18         MR. KIMBLE:  We do.

19         THE COURT:  Okay.

20         MR. KIMBLE:  But it's not clear on its face -- there's

21    not much detail about the technology that's covered, the

22    products that are covered, any products that are in suit now.

23         THE COURT:  I'm sorry.  Was Atratech a Settlement

24    Agreement or was it a Licensing Agreement without litigation?

25         MR. KIMBLE:  I believe it was a Settlement and

1    Licensing Agreement.

2              THE COURT:  Okay.

3              And so, the cold cathode tube, that was based on going

4    back and seeing what was actually being sued about, right?

5              MR. LO:  That's correct, your Honor.  And my point on

6    this was that the plaintiffs are confusing an inability to

7    answer the question with unpreparedness for a 30(b)(6) witness.

8    Rule 30(b)(6) requires preparation not knowledge.

9              Mr. Brinkman, and they confirmed this in the

10   deposition, looked at the Atratech remaining product in their

11   deposition, he was the one that signed the Atratech agreement.

12             That agreement was signed in 2010, nearly six years

13   ago, as a result of the litigation that started in 2008, nearly

14   eight years ago.

15             He's the guy that would know and he didn't.  I don't

16   know whether he forgot or just never knew in the first place.

17             But, in any event, he --

18             THE COURT:  He forgot what, that it was a cold cathode

19   tube?

20             MR. LO:  Yes, yes.  I think it was just the passage of

21   time.

22             I'm not even sure that they asked that specific

23   question.  But, in any event, he's the guy at the company that's

24   knowledgeable.

25             And we only -- and counsel only gave the additional

1    information in the letter based on our own Independent research

2    over the weekend in preparation for our responsive letter.

3           THE COURT:  Mr. Kimble, you're saying that on the

4    License Agreement, basically your argument is that he was

5    unprepared on Atratech?

6           MR. KIMBLE:  That's right.  He did sign the agreement.

7    He had looked at the agreement.

8           It's pretty obvious he didn't look at anything else to

9    understand how the agreement came to be.  That's our point.

10          THE COURT:  All right.

11          So, I'm going to deny this on the License Agreement,

12   because while it's possible that Mr. Brinkman could have been

13   more fully prepared, you know, if it was really about License

14   Agreements, and he had read the only License Agreement that was

15   actually being discussed.  I don't think the fact that he had

16   done something that I think actually, you know, generally is not

17   something that you would expect of a 30(b)(6) witness, to go

18   back and check the docket in the litigation, I don't think that

19   means that there should be a second chance, so I'm going to

20   cross that one off.

21          And I can't figure out -- all right.

22          So, the only thing that's left is, quote, "document

23   collection."

24          What is that about?

25          MR. KIMBLE:  Well, so, we asked questions about who

1  were the custodians, where were the documents pulled from, how

2  were they located?

3          THE COURT:  Oh, this is the one where he said, well,

4  legal was doing that?

5          MR. KIMBLE:  Yes, sir.  And we think we're entitled to

6  -- obviously, when it comes to document collection, there is a

7  mix.  There's privileged issues and non-privileged issues.

8          We're entitled to some information about, you know, who

9  went where, those types of things.  And he just wasn't able to

10  do it, because apparently, so he says, counsel took care of it.

11          I think we're entitled to, through him or someone else,

12  some more specific answers to those questions.

13          THE COURT:  Mr. Lo?

14          MR. LO:  The entire conversation about document

15  collection took place in about five to ten minutes on the

16  record, maybe even less.

17          And the result of that is, you saw Mr. Kimble and Mr.

18  Brinkman kind of like two ships crossing in the night.

19          If I can give you a little bit of a background, because

20  these questions were not asked.  I think it will explain why Mr.

21  Brinkman answered the question the way he did.

22          The way that VIZIO stored the documents that Mr. Kimble

23  was asking about is that there is a central location where --

24  this is where the technical documents for Model 1,2,3 would be.

25          When we have a litigation, we need to grab it, and

1    that's where we would go to do it.

2         He never asked those back-up questions.  He skipped

3    straight to the question of, what custodian did you collect

4    from?

5         And in the deposition, Mr. Brinkman was just -- he was

6    a little bit muffed, because he had no idea what it means to be

7    a custodian in the context of that kind of system.

8         In other words, does anybody who had access to it, is

9    that person a custodian?  Who owns the server?

10        So, he knows where the documents came from, he knows

11   how they were kept, he knows who went to get them, but he didn't

12   know who the custodians were, because that's just not a way that

13   they think about it in the context of how they stored those

14   particular documents.

15        THE COURT:  Mr. Kimble, do you have anything more?

16        MR. KIMBLE:  Well, I think -- look, I think there has

17   to be some document custodians.  I understand that in-house

18   counsel testified one or more of them went and got documents

19   from people.

20        Who were those people, when was it collected, did they

21   run any search terms?

22        That would not be privileged.

23        THE COURT:  Even though I think where they said -- Mr.

24   Lo said they didn't do search terms, because they have this

25   repository system.

1          MR. KIMBLE:  Okay.  I did not understand him to say

2    that.  Maybe that's correct.

3          I thought what they did was mix together the fact that

4    we're not searching for e-mails with whether how you look for

5    electronic information.

6          THE COURT:  Maybe it is.

7          Am I wrong, Mr. Lo?

8          MR. LO:  We do not use search terms.

9          MR. KIMBLE:  Fair enough.

10          THE COURT:  All right.

11          So, I'm going to deny this, too.  So, I'm going to deny

12    No. 2 in the Proposed Order entirely.

13          Do you want to have a 30(b)(6) witness on the documents

14    that VIZIO is going to be producing in response to No. 1?

15          MR. KIMBLE:  Yes, your Honor.

16          THE COURT:  All right.

17          Mr. Lo, it seems to me that it's probably a good idea

18    to have a good 30(b)(6) witness on those.  I don't suspect it

19    has to be terribly long.

20          Do you want to open the bidding as to how long it

21    should be?

22          MR. LO:  Well, first of all, I'll just categorize three

23    categories of documents.  I would suggest market share data we

24    saw generated by third parties, that we have them, I don't think

25    there should be a 30(b)(6) on that.

1               And so, without caveats, I would suggest two hours.

2               MR. KIMBLE:  We have to -- we need to, or at least we

3    may have to present evidence through witnesses.  We'll need to

4    be able to show corporate representatives certain documents that

5    we think we may want to use.

6               THE COURT:  How much time?

7               MR. KIMBLE:  All together?

8               THE COURT:  Yes.

9               MR. KIMBLE:  I would suggest as a starting point four

10   hours for the three topics.

11              THE COURT:  Four hours seems to me a little bit on the

12   high side, but I'm going to say four hours, because presumably,

13   if you've exhaust yourself, you'll stop.

14              MR. KIMBLE:  Yes, your Honor.

15              THE COURT:  Four hours.  And, in terms of these

16   documents, we don't actually -- it says within ten days of this

17   Order.

18              Is that actually something you can do, Mr. Lo?

19              MR. LO:  If I could get 14, I think that would be

20   safer.

21              THE COURT:  Okay.  I'm going to give you 14.

22              And so, presumably the Rule 30(b)(6) witness would be

23   at least 21 days from now.

24              MR. LO:  Yes, we'll endeavor to produce the documents

25   earlier.  And if we do, we'll offer the witness earlier.

1             THE COURT:  Okay.  So, that's the last one of these.

2             So, I'm going to sign that.

3             So there's one other thing that I think I ought to

4    talk about here, unless you tell me we don't need to, which is,

5    I had suggested when we could have the trials in this.

6             The discovery closes April 30th, and the first trial

7    should be December something of 2016, with the other two in

8    early 2017.

9             So, I guess the first question is, it kind of makes

10   sense to me that the first trial should involve LG.

11            MR. BRAGALONE:  That's fine, your Honor.

12            We actually did discuss this, and local counsel did,

13   and we actually have arrived at an agreed schedule.

14            THE COURT:  Okay.  We need to discuss it any further.

15            MR. BRAGALONE:  Subject to the dates on your Honor's

16   schedule for the Pretrial Conference, but we have come up with

17   agreed dates subject to working with your calendar.

18            THE COURT:  Okay.  All right.

19            If you want to talk to my staff, they're available.

20   Not this very minute but they're available.

21            Let's get some Orders in place.

22            And I appreciate your talking to each other and coming

23   up with a schedule.

24            Mr. Lo, are you still standing?

25            Do you have a problem or you just didn't want to be

1    impolite?

2         MR. LO:  No, because when you said there were

3    additional issues that you had.

4         THE COURT:  Okay.  Well, that was the only additional

5    issue that I had.

6         MR. BRAGALONE:  And we'll submit this.

7         The question that we have, your Honor, and I know we'll

8    look at this -- we had a pretrial conference the Tuesday after

9    the Thanksgiving holiday to give an extra day of travel, you

10   know, so that we don't be traveling --

11        THE COURT:  What's the date there?

12        MR. BRAGALONE:  It's November 29th.

13        THE COURT:  And the trial, I think, was December 11th?

14        MR. BRAGALONE:  December 5th.

15        THE COURT:  Okay.  All right.

16        That's fine.

17        MR. BRAGALONE:  Okay.

18        THE COURT:  I mean, I say that's fine by me, but you do

19   have to talk to the important people, which is my staff.

20        So let me hand back the confidential consulting

21   agreement of June 14th of 2013, which I believe my law clerk has

22   a few other things that were handed up, unless someone wants me

23   to keep those for some reason, and I can hand them all back to

24   whomever I got them from?

25        MR. BEABER:  Your Honor, one thing on scheduling?

1          THE COURT:  Yes.

2          MR. BEABER:  You ordered a number of depositions for LG

3   Display, and I know that what we agreed to was the close of

4   discovery, and that you ordered on April 30th.

5          I have some concern as to whether we'll be able to do

6   the number of depositions that you ordered, in addition to the

7   depositions that are already scheduled.  We have some scheduled

8   depositions that haven't occurred yet.

9          THE COURT:  Well, as far as I'm concerned, if you need

10   an extra two weeks to do these ones that came up today, that's

11   no problem.  I don't think that's going to prevent you from

12   getting on to the expert portion of the case.

13          MR. BEABER:  Agreed, your Honor.

14          And the other point that I guess I wanted to raise is,

15   we filed a Motion to Stay based on the additional IPRs, and I

16   don't know if that impacts the schedule, but I wanted to say

17   that we agreed.

18          THE COURT:  It's not going to impact the schedule,

19   okay?  But I'll wait until I get some more briefing.

20          But, you know, just generally, it's too late, all

21   right?

22          All right.

23          Is there anything else?

24          MR. KLEIN:  Just one thing, if I may, your Honor?

25          THE COURT:  Mr. Klein.

1        MR. KLEIN:  We went and checked on the CPT Agreements

2    --

3        THE COURT:  Okay.

4        MR. KLEIN:  -- over the break, and it was produced on

5    January the 6th, 2016, and it was LENDDG00061763 through 61778.

6        THE COURT:  Okay.  Well, thank you.

7        All right.

8        If there's nothing else, I expect these five Orders

9    will be filed later today.

10        MR. FARNAN:  Your Honor, one more issue just on the

11    trial date for Lenovo and VIZIO.

12        THE COURT:  Yes.

13        MR. FARNAN:  Do you want us to call and get those dates

14    from your staff or -- because right now we've got the LG --

15        THE COURT:  Right, right.  I figured -- well, I guess I

16    figured a couple of things, one of which is, you don't actually

17    understand how having the LG trials going to make these other

18    two trials go away.

19        That's something, I guess, for another day.

20        So, yes, just call my staff.  I'm thinking, you know,

21    February, March, something like that.

22        MR. FARNAN:  Thank you.

23        THE COURT:  Ms. Kraman?

24        MS. KRAMAN:  I can't speak for the other defendants,

25    but I believe that the VIZIO Order would immediately be docketed

1    under seal.

2              THE COURT:  Let me just check.

3              Which order is that?

4              That's the one -- all right.

5              This is your corrected Proposed Order or the --

6              MS. KRAMAN:  Correct.  I believe it contains plaintiffs

7    --

8              MR. LO:  It's up to plaintiffs, because, for example,

9    we named the parties that have encumbrances in the Order, so

10   it's up to the plaintiffs what they want to do.

11             THE COURT:  Well, I think the letter -- oh, I see.

12             Well, you know, I'm not going to file it under seal.

13             MR. BRAGALONE:  Perhaps it could just say that that

14   request is denied.

15             THE COURT:  No, I'm just going to file it.

16             MR. BRAGALONE:  Okay.

17             THE COURT:  Anything else?

18             (No response.)

19             All right.

20             Thank you very much.  Have a nice day.

21             (The proceedings adjourned at 1:36 o'clock p.m.)

22                        *  *  *  *  *

23

24

25